**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DONNA CONZUELLA JOHNSON,

*Defendant-Appellant.*

No. 06-4391

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHN ALBERT MARTIN, JR.,

*Defendant-Appellant.*

No. 06-4392

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CRAIG ARNOLD SCOTT, a/k/a Craig Levi,

*Defendant-Appellant.*

No. 06-4527

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Roger W. Titus, District Judge.
(8:04-cr-00235-RWT)

Argued: September 24, 2009

Decided: December 2, 2009

Before WILKINSON, SHEDD, and AGEE, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Shedd and Judge Agee joined.

---

**COUNSEL**

**ARGUED**: Gregory Bruce English, ENGLISH & SMITH, Alexandria, Virginia; Daniel H. Ginsburg, BENNETT & BAIR, LLC, Greenbelt, Maryland; Jason E. Silverstein, ROLAND WALKER & MARK ZAYON, PA, Baltimore, Maryland, for Appellants. Deborah A. Johnston, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Gary E. Bair, BENNETT & BAIR, LLC, Greenbelt, Maryland, for Appellant John Albert Martin, Jr.; Roland Walker, ROLAND WALKER & MARK ZAYON, PA, Baltimore, Maryland, for Appellant Craig Arnold Scott. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Bonnie S. Greenberg, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Donna C. Johnson, Craig A. Scott, and John A. Martin were convicted of conspiracy and other offenses in relation to the distribution of narcotics. On appeal, they raise various

claims, some collectively and others individually. After careful consideration, we find that these claims lack merit, and we affirm the judgment of the district court.

I.

This case involves an extensive drug-trafficking organization that operated in Maryland, the District of Columbia, New York, and elsewhere. The major figures in this organization included Paulette Martin, Gwendolyn Levi, and Moises Uriarte. From March until June 2004, investigators, acting with court authorization, tapped Paulette Martin's phone lines. From these wiretaps, they learned that Paulette Martin was obtaining heroin from Levi. As a result, they obtained authorization to tap Levi's cellular phone line and intercepted her communications with her heroin supplier, Uriarte. In June 2004, the investigation culminated in the arrest of over thirty individuals and the execution of over twenty search warrants.

Johnson, Scott, and John Martin were each tied to the organization in different ways. Johnson accompanied Levi to purchase heroin from Uriarte on at least one occasion. On April 23, 2004, officers observed Johnson and Levi drive from Levi's Maryland residence to a furniture store in New York City to meet Uriarte. Levi entered the store carrying a box containing about a quarter of a million dollars and exited with a gift-wrapped package that she placed in the trunk of the vehicle. That night, Johnson and Levi drove back into Maryland, where state police pulled them over. The police searched the trunk and seized the package, which contained approximately 2300 grams of heroin. Johnson and Levi were then arrested.

Scott is Levi's son. Calls intercepted in April 2004 revealed that he helped Levi process and distribute heroin. On one occasion, he complained to Levi that several of his heroin customers were "on hold." Levi instructed him to obtain fifty grams of heroin from her basement, and he later confirmed

that he had done so. On another occasion, Levi asked Scott to go to her house and package some heroin for distribution, which Scott later confirmed he had done. Subsequent to Levi's arrest, officers executed a search warrant at her home and found a heroin processing operation in her basement, the location from which she had directed Scott to obtain the heroin.

John Martin resided with Paulette Martin in Maryland and helped her distribute cocaine and heroin.* Investigators intercepted numerous phone calls in which John Martin discussed his drug-trafficking activities with Paulette Martin and others. On one occasion, John Martin and Paulette Martin discussed moving her drug supply from their residence to a performing arts school, which Paulette Martin used as a front for various illegal activities. On June 1, 2004, officers executed search warrants at both their residence and the school. At the residence, they discovered, among other things, cocaine, cocaine base, over $7000 in cash, a digital scale, and a sheet of paper indicating money owed to "Gwen." They also recovered a black shaving kit, containing heroin, cocaine, and an employment check in John Martin's name. At the school, they discovered, among other things, more cocaine, cocaine base, and heroin—much of which was packaged for distribution.

Johnson, Scott, and John Martin were among many individuals indicted in connection with this drug conspiracy in the United States District Court for the District of Maryland. The three were tried together in November and December 2005. On December 22, 2005, a jury convicted all three defendants of conspiring to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (2006). In addition, Johnson was convicted of traveling in interstate commerce in the commission of unlawful activity in violation of 18 U.S.C. § 1952 and possession with intent to distribute

---

*According to Martin's brief, he and Paulette Martin have never been married and are not related.

heroin in violation of 21 U.S.C. § 841. Scott was convicted of the use of a communications device to facilitate narcotics trafficking in violation of 21 U.S.C. § 843(b) and possession with intent to distribute heroin in violation of 21 U.S.C. § 841. Lastly, the jury convicted Martin of three counts of the use of a communications device to facilitate narcotics trafficking in violation of 21 U.S.C. § 843(b).

The district court sentenced Johnson to 135 months imprisonment and five years supervised release, Scott to 150 months imprisonment and five years supervised release, and Martin to 375 months imprisonment and ten years supervised release.

On appeal, Johnson, Scott, and Martin raise various claims, some collectively and some individually. Collectively, they contend, first, that the district court abused its discretion by not granting a mistrial when a government witness refused to testify and, second, that they were prejudiced by prosecutorial vouching during closing argument. Individually, Johnson challenges the sufficiency of the evidence supporting her three convictions. Also individually, Martin challenges the admission of expert testimony and a prior conviction. He also raises two sentencing issues. We address these claims in turn and set forth additional facts as they become necessary.

## II.

The defendants first contend that the district court abused its discretion by not granting a mistrial when Gwendolyn Levi, a government witness, took the stand and refused to testify. According to the defendants, the government put Levi on the stand with the knowledge that she would refuse to testify and thereby cause the jury to infer that she had incriminating information about the defendants.

## A.

Levi entered into a plea agreement with the government that required her to testify at trial. But on the night before she

was scheduled to take the stand, she met with prosecutors and informed them that she no longer intended to testify. She did not, however, provide any explanation for her change of heart, nor did she indicate that she might invoke her Fifth Amendment privilege against self-incrimination. During the meeting, she was extremely emotional and said that some of her family members were encouraging her to testify. By the end, she agreed to reconsider the matter overnight, taking her family's advice into account.

The next day, the government called Levi to the stand. She took the oath and answered a few questions about her background. After testifying that she was arrested in April 2004, she refused to answer any more questions. At that point, the district court excused the jurors and then questioned Levi outside of their presence. Levi stated that she simply did not wish to testify and denied that she was concerned about incriminating herself or her son, Craig Scott. After consulting with her attorney, however, she informed the court that she did not wish to testify because of her privilege against self-incrimination. In response, the government obtained an immunity order to compel her to testify, but Levi still refused.

Ultimately, the district court held Levi in contempt of court and gave the following instruction to the jury:

> You may recall that a witness by the name of Gwendolyn Levi was called to the stand and testified briefly, and then she decided she did not wish to testify further. I have ordered her testimony stricken. You should disregard in its entirety everything you heard out of the mouth of Gwendolyn Levi. You should also draw no inference in any way, shape or manner concerning her decision that she did not wish to further testify.

J.A. 1785. The district court also denied the defendants' motion for a mistrial. It specifically found that the govern-

ment had engaged in no misconduct regarding Levi's expected testimony and that any inference that was created by Levi's refusal to testify did not add critical weight to the government's case.

## B.

We review a district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Allen*, 491 F.3d 178, 189 (4th Cir. 2007). The Supreme Court has noted two circumstances in which a government witness's invocation of a testimonial privilege may constitute reversible error. *Namet v. United States*, 373 U.S. 179, 186-87 (1963). The first is "when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Id.* at 186. The second is when "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187. Neither of these circumstances was present here.

Regarding the first, the district court specifically found "no basis to find any misconduct on the part of the prosecutor," and the record supports that conclusion. J.A. 2721. While the government knew that Levi was hesitant to testify, it had a reasonable basis to expect that she would. First of all, she risked violating her plea agreement if she refused. Second, she indicated that some of her family members were encouraging her to testify and said that she would take their advice into account. Third, she did take the stand and recite the oath; at that point, it was reasonable for the government to assume that she had resolved her internal conflicts and decided to fulfill her commitment to testify. What is more, once Levi finally invoked her Fifth Amendment privilege, the government promptly obtained an immunity order to compel her to testify. This is not a case where the government attempted to build its case out of improper inferences. The record is clear that the

prosecution wanted Levi to testify and reasonably expected she would.

Regarding the second, the district court also specifically found "no basis for concluding that . . . there[ ] [was] prejudice" to the defendants, and the record supports this conclusion as well. J.A. 2722. There is reason to doubt that Levi's appearance had much effect; this was a brief episode in a month-long trial in which the government presented substantial evidence of the defendants' guilt. But even if Levi's refusal to testify did prejudice the defendants, that prejudice was cured by the district court's instruction. That instruction let the jurors know in no uncertain terms that they were to disregard her appearance entirely and draw no inferences from her refusal to testify. We presume that juries follow such instructions. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). And we see no reason why that presumption should be rebutted here. Accordingly, we find that the district court did not abuse its discretion in declining to grant a mistrial.

### III.

All three defendants next contend that the prosecutor improperly vouched for the credibility of the government's witnesses during her closing argument. Near the outset of her closing argument, the prosecutor stated to the jury, "I'm convinced, by the close of the arguments, that you will find there is sufficient evidence to find each and every one of the defendants guilty beyond a reasonable doubt." J.A. 2585. Defense counsel objected that she was stating a personal opinion, and the district court instructed her, "Just state what you think the evidence will show." J.A. 2585-86. The prosecutor continued, "I think, based on the evidence presented, that you will find each and every one of the defendants guilty beyond a reasonable doubt of each and every one of the counts of the indictment before you." J.A. 2586. She then proceeded to describe the evidence to the jury.

The defendants argue that, by using the phrases "I'm convinced" and "I think," the prosecutor improperly conveyed her personal opinion that the government's witnesses were credible. We disagree.

A prosecutor may not vouch for government witnesses during her closing argument. *United States v. Sullivan*, 455 F.3d 248, 259 (4th Cir. 2006). "Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness." *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993). The rule against vouching exists because "the prosecution's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985).

In this case, the prosecutor did not engage in vouching by using the phrases "I'm convinced" and "I think." The remarks here are similar to the ones at issue in *United States v. Adam*, where this court found that a prosecutor used phrases like "I think" in an "innocuous, conversational sense" rather than as "an attempt to replace the evidence with the prosecutor's personal judgments." 70 F.3d 776, 780 (4th Cir. 1995). The same is true here. A reasonable juror, looking at these remarks in context, would have taken them as nothing more than an "innocuous, conversational" way for the prosecutor to introduce her review of the evidence. The prosecutor did not follow up "I think" by suggesting that a witness was trustworthy; instead, she proceeded to say that "based on the evidence presented" the jury would find the defendants guilty and then discussed that very evidence.

At oral argument, the defendants urged us to hold that prosecutors must use more impersonal phrases such as "I submit" or "I contend" in lieu of "I'm convinced" or "I think." We decline to do so. We doubt that the difference between these two sets of phrases has much practical import. But even if we

were to grant that it is preferable for prosecutors to use the former, "we recognize that great latitude is accorded counsel in presenting closing arguments to a jury." *United States v. Ollivierre*, 378 F.3d 412, 418 (4th Cir. 2004), *sentence vacated on other grounds by Olliviere*, 543 U.S. 1112 (2005). In our adversary system, prosecutors are permitted to try their cases with "earnestness and vigor," *Berger v. United States*, 295 U.S. 78, 88 (1935), and "the jury is entrusted within rea- son to resolve . . . heated clashes of competing views." *Bates v. Lee*, 308 F.3d 411, 422 (4th Cir. 2002).

Closing argument, in particular, is a time for energy and spontaneity, "not merely a time for recitation of uncontro- verted facts." *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994). It should not be subject to a voluminous code of courtroom etiquette. For if it were, prosecutors would be left to walk on egg shells, and the quality of advocacy would suffer. To be sure, there are some lines that prosecutors may not cross. *See*, *e.g.*, *Griffin v. California*, 380 U.S. 609, 615 (1965) (commenting on a defendant's decision not to testify). But to parse through a prosecutor's closing statement for minor infelicities loses sight of the function of our adversary system, which is to engage opposing views in a vigorous manner.

The defendants also contend that the remarks in question created the impression that the prosecutor had information from Gwendolyn Levi indicating that the defendants were guilty that was not available to the jury. In support of this the- ory, the defendants point out that the prosecutor alluded to Levi's anticipated testimony in her opening statement but that Levi never actually testified at trial. Although the defendants do not frame it as such, their argument appears to be a claim of improper bolstering. *See United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997) ("[B]olstering is an implication by the government that the testimony of a witness is corrobo- rated by evidence known to the government but not known to the jury."). Regardless of how the argument is framed, it has

no merit. The prosecutor made no reference to Levi's aborted testimony in her closing statement. It is thus pure speculation to suppose that the jury understood the phrases "I'm convinced" and "I think" to be a subtle hint involving Levi.

Finally, even if we were somehow inclined to find that the disputed comments were improper, no retrial would be necessary because the defendants have failed to show that the comments so prejudicially affected their substantial rights as to deprive them of a fair trial. *See United States v. Jones*, 471 F.3d 535, 542 (4th Cir. 2006); *Sanchez*, 118 F.3d at 198.

## IV.

We now turn to the individual claims. Johnson's sole individual claim is that the evidence presented at trial was insufficient to support her three convictions. She contends that the evidence against her consisted of little more than the fact that she was driving a car in which drugs were found. But the record actually shows that the government presented substantial other evidence of her guilt. Among other things, it produced a telephone call in which Levi and Johnson discussed whether Levi had been in contact with Uriarte and testimonial and video evidence that Johnson was very nervous during the stop of the vehicle. We have carefully reviewed this evidence under the standard in *United States v. Burgos*, 94 F.3d 849, 862-63 (4th Cir. 1996) (en banc), and we conclude it was sufficient to support the jury's verdict.

## V.

Martin raises four individual claims. First, he contends that the district court admitted the testimony of two expert witnesses in violation of his Sixth Amendment right "to be confronted with the witnesses against him" because the experts based their opinions in part on testimonial statements from unidentified declarants.

A.

As noted above, the government received court authorization and intercepted telephone calls between various members of the drug conspiracy. To help the jury interpret those calls at trial, the government presented two police officers, Sergeant Christopher Sakala and Corporal Thomas Eveler, as experts on the subject of drug trafficking. Both officers had extensive training and experience, and Martin does not question their qualifications.

Sakala and Eveler testified that several seemingly innocuous terms used in these calls, such as "tickets" and "T-shirts," were actually code words for narcotics. Sakala explained how he reached his conclusions. Because drug traffickers frequently use code words to avoid detection, he looked for "patterns of conversation[ ] that [did not] make sense." J.A. 161. For example, members of this conspiracy often discussed buying and selling large numbers of "tickets" but did not specify "which shows they wanted tickets for . . . . where they wanted to sit, [or] what days they wanted to go to the show." J.A. 162. Therefore, it became "obvious" in his view that "tickets" was a code word for narcotics. *Id.*

Likewise, Eveler explained that he decoded the conversations by looking for unusual "pattern[s] of speech." J.A. 416. During Eveler's cross-examination, the following occurred. Eveler was asked if he was basing his conclusions on "context, . . . the manner of speaking and a variety of other matters," and he responded:

> Yes, I'm basing it on the context—as you said, I'm basing it on other events occurring around the time of the intercepted call. I'm basing it on the known nature of the organization. I'm basing it on informant information, on interviews I've done, on evidence that was seized and on the entire—on all the

facts that were developed the course of the investigation.

J.A. 740. Martin then objected that Eveler was presenting testimonial hearsay to the jury. The district court overruled the objection, explaining:

> Someone who gives opinions on the meanings of terms of drug transactions has got to rely upon not just what they've heard on a particular tape but upon their experience in the field of drug communications and that may have come about through being on the streets. These are things that form their expertise. I think it's more than the scope of traditional expert testimony for him to rely upon some things.
>
> I'm not going to allow him to come in here and testify to the things that would be classic hearsay testimony about what someone else in this case told him, . . . that's not what I'm going to do. I think the foundation for the opinions he gives can include information he learns through activities on the streets and through discussions with informants in a general sense of how drug people communicate with each other.

J.A. 743-44.

Later in the trial, Sakala took the stand again. On direct examination, he explained that he considered several sources of information, such as evidence that had been seized during the investigation, before reaching a conclusion about the meaning of a particular conversation. In addition, he took into account "interviews with witnesses, cooperators, [and] cooperating defendants." J.A. 1170. Martin again objected, and the district court overruled on the same grounds as above.

On appeal, Martin contends that the district court's rulings violated the Confrontation Clause as interpreted by *Crawford*

*v. Washington*, 541 U.S. 36 (2004), because the experts based their opinions on testimonial interviews with informants and cooperating witnesses.

### B.

In *Crawford*, the Supreme Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." 541 U.S. at 53-54. "[F]or a statement to be testimonial, the declarant must have had a reasonable expectation that his statements would be used prosecutorially . . . ." *United States v. Udeozor*, 515 F.3d 260, 269 (4th Cir. 2008). *Crawford* forbids the introduction of testimonial hearsay as evidence in itself, but it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence.

An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion" would provide an end run around *Crawford*. *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007). For this reason, an expert's use of testimonial hearsay is a matter of degree. *See* Ross Andrew Oliver, Note, *Testimonial Hearsay as the Basis for Expert Opinion: The Intersection of the Confrontation Clause and Federal Rule of Evidence 703 After* Crawford v. Washington, 55 Hastings L.J. 1539, 1560 (2004)(describing a "continuum of situations" in which experts rely on testimonial hearsay). The question is whether the expert is, in essence, giving an independent judgment or merely acting as

a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem. The expert's opinion will be an original product that can be tested through cross-examination.

This is as it should be because expert witnesses play a valuable role in our criminal justice system. As recognized in Federal Rule of Evidence 702, experts often "assist the trier of fact to understand the evidence or to determine a fact in issue." To better fulfill this role, experts are permitted to consider otherwise inadmissible evidence as long as it is "of a type reasonably relied upon by experts in the particular field." Fed. R. Evid. 703. Some of the information experts typically consider surely qualifies as testimonial under *Crawford*. Were we to push *Crawford* as far as Martin proposes, we would disqualify broad swaths of expert testimony, depriving juries of valuable assistance in a great many cases. Here, for example, it was permissible for the district court to conclude that the expert testimony would help the jury understand exchanges that might otherwise appear nonsensical or impenetrable.

It is nonetheless appropriate for district courts to recognize the risk that a particular expert might become nothing more than a transmitter of testimonial hearsay and exercise their discretion in a manner to avoid such abuses. Turning to the facts here, there is no question that Sakala and Eveler did not become mere transmitters of testimonial hearsay. Assuming for the sake of argument that the interviews they considered were testimonial, the experts never made direct reference to the content of those interviews or even stated with any particularity what they learned from those interviews. Instead, each expert presented his independent judgment and specialized understanding to the jury. That understanding was not surprisingly the product of the accumulation of experience over many years of investigation of narcotics organizations and contacts with the informants and witnesses who operate within them. Sakala and Eveler explained how, based on their

knowledge of narcotics trafficking, they were able to identify odd conversational patterns in the phone calls and decipher various code words. The fact that their expertise was in some way shaped by their exposure to testimonial hearsay does not mean that the Confrontation Clause was violated when they presented their independent assessments to the jury. Because they did not become mere conduits for that hearsay, their consideration of it poses no *Crawford* problem.

This case differs, for example, from the Second Circuit's case in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008). In that case, an expert stated, among other things, that a gang "taxed" non-gang members who wanted to deal drugs in bars controlled by the gang. The expert explained that he was told this important fact "*by a gang member*" during a custodial interview. *Id.* at 188. In other words, the expert simply passed along an important testimonial fact he learned from a particular interview. Thus, it was hard to believe that he applied any independent expertise to the substance of his testimony. *Id.* at 199. Nothing of that sort happened here, however. The experts were applying their expertise, derived over many years and from multiple sources, to interpret the transcripts of phone conversations. And the district court took pains to guard against the danger that the experts would become, in essence, mere conduits for testimonial hearsay. As it explained with regard to Officer Sakala, "He is not being asked to provide what someone else told him. He is using his information and his experience and whatever other information he may have derived from his investigation to interpret what is being said during this phone call . . . ." J.A. 1171.

In addition to providing independent judgments, the experts in this case were in fact subject to cross-examination, as required by the Confrontation Clause. This availability for cross-examination sets the circumstances here apart from those presented in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009). There, the government produced an expert's testimony in the form of an affidavit but did not put the expert

on the stand or demonstrate both that the expert was unavailable and the defendant had a prior opportunity to cross-examine him. *Id.* at 2532. Here, however, both experts took the stand. Therefore, Martin and his co-defendants, unlike the defendant in *Melendez-Diaz*, had the opportunity to test the experts' "honesty, proficiency, and methodology" through cross-examination. *Id.* at 2538. And judging from the record, they did so effectively. For example, Sakala conceded during cross-examination that there were some conversations in which the word "tickets" was actually being used in its normal sense. This situation was, therefore, a far cry from the one in *Melendez-Diaz* where the expert was nowhere to be found.

Where, as here, expert witnesses present their own independent judgments, rather than merely transmitting testimonial hearsay, and are then subject to cross-examination, there is no Confrontation Clause violation. Accordingly, we find no error in the admission of Sakala and Eveler's testimony.

## VI.

Martin next contends that the district court abused its discretion by admitting his 1980 conviction for armed robbery for impeachment purposes. Assuming that the district court erred in admitting these convictions, we conclude that the error was harmless.

## A.

Although the record is murky, the facts relevant to Martin's claim appear to be as follows. Before Martin took the stand, the government sought permission from the district court to impeach him with his 1980 conviction for robbery with a deadly weapon and use of a handgun under Federal Rule of Evidence 609. Under this rule, evidence of a prior conviction punishable by over one year of imprisonment is admissible for impeachment purposes "if the court determines that the probative value of admitting this evidence outweighs its prej-

udicial effect to the accused." Fed. R. Evid. 609(a)(1). If, however, "a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date," then evidence of the conviction is inadmissible unless "the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b).

Confusion arose about whether Martin had been confined for his 1980 conviction within ten years of the 2005 trial. The government produced two reports which suggested that Martin had been paroled for the conviction in November 1988 but reincarcerated from April 2000 until May 2001 due to a parole violation. According to Martin, however, these reports did not reflect the fact that the relevant commissioner determined that he was not in violation of his parole and consequently restored him to his previous parole status. In Martin's view, the operative date for purposes of Rule 609 was therefore November 1988, not May 2001.

The district court took the government's view and admitted the prior conviction under Rule 609(a)(1). As a result of that ruling, the government used the conviction to impeach Martin during cross-examination.

After the jury convicted Martin in this matter, the probation office prepared a presentence report. The report indicated that Martin had been paroled for his 1980 conviction in November 1988, but it made no mention of a 2000 parole violation or resulting reincarceration. As the government now concedes, this report contradicts the earlier reports on which the government relied in the district court.

## B.

We review a district court's evidentiary rulings for abuse of discretion and subject such rulings to harmless error review.

*United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997).
Martin raises several potential errors that the district court
made in admitting the 1980 conviction, but we need not
address them. Assuming that the district court erred in admit-
ting the conviction, that error was harmless. "Any error,
defect, irregularity, or variance that does not affect substantial
rights must be disregarded." Fed. R. Crim. P. 52(a). Errone-
ously admitted evidence is harmless if a reviewing court is
able to "say, with fair assurance, after pondering all that hap-
pened without stripping the erroneous action from the whole,
that the judgment was not substantially swayed by the error."
*Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *Brooks*,
111 F.3d at 371.

Here, we are able to say with fair assurance that the jury's
verdict was not substantially swayed by the admission of
Martin's 1980 conviction. First of all, the government pro-
duced substantial evidence of Martin's guilt, including drugs
and drug paraphernalia seized from his residence and the per-
forming arts school and numerous intercepted phone calls in
which Martin discussed drug distribution. Second, Martin
made several admissions that undermined his credibility.
Among other things, he stated that he used cocaine and heroin
"daily" during 2004, sold marijuana, and lied to an employer
about his drug use and criminal history. Third, the govern-
ment impeached Martin with drug possession convictions
from 1996 and 2002. Those convictions were both more
recent and more closely related to the crimes for which he
was on trial than was the 1980 conviction. Given that the jury
had substantial evidence of Martin's guilt and several power-
ful reasons to doubt his credibility, we do not think that its
verdict was affected by the prosecutor's mention of the 1980
conviction. Thus, we conclude that any potential error was
harmless.

## VII.

We now turn to Martin's sentence. At his sentencing hear-
ing on April 6, 2006, the district court attributed more than

1.5 kilograms of crack cocaine to Martin and consequently assigned him a base offense level of 38, using the drug quantity table then in effect. *See* U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2D1.1 (2005 & Supp. 2006). It then applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, yielding a total offense level of 40. Because of Martin's criminal history category of VI, the resulting guidelines range was 360 months to life imprisonment. In the alternative, the district court reasoned that, even if it had erred in its drug quantity calculations, Martin's offense level would nonetheless be bumped up to 37 due to his career offender status under U.S.S.G. § 4B1.1. Given his criminal history category of VI, the resulting guidelines range would be the same as above: 360 months to life.

Martin then requested a downward variance based on his age, the age of his family members, and what he described as his relatively minor role in the conspiracy. After hearing argument from both parties, the district court reviewed the factors in 18 U.S.C. § 3553(a) and denied Martin's request. It imposed a sentence of 375 months' imprisonment, explaining that the low end of the advisory range was inappropriate given Martin's "significant and long-running involvement with drug distribution." J.A. 2862.

On appeal, Martin contends that he must be resentenced in light of *Gall v. United States*, 128 S. Ct. 586 (2007), which was decided after his sentencing hearing. According to Martin, *Gall* relaxed the appellate standard of review for sentences that are outside of the advisory guidelines ranges. Had the district court known that a non-guidelines sentence would be accorded deference under *Gall*, he argues, it may well have granted him the variance he requested. This claim is not only foreclosed by our precedent but also based on unsubstantiated speculation.

In *United States v. Curry*, we rejected this very claim, holding that our review was limited to the reasonableness of "the

actual sentence imposed by the court." 523 F.3d 436, 439 (4th Cir. 2008). Whether the district court felt "constrained" by this court's pre-*Gall* standard of review for non-guidelines sentences had "no impact on this court's inquiry into whether the actual sentence imposed was reasonable or not." *Id.* at 441. While that holding controls here, we also note that, unlike the defendant in *Curry*, Martin can point to nothing in the record that suggests that the district court felt constrained by this court's pre-*Gall* cases. Here, the district court did not even sentence Martin at the low end of the advisory range, so it is highly unlikely that it would have gone outside that range had it only known about *Gall*'s standard of review.

Instead of addressing a "hypothetical sentence[ ] that the sentencing judge did not give," *Curry*, 523 F.3d at 439, we review Martin's actual sentence for reasonableness. Under *Gall*, our review has two steps. First, we must "ensure that the district court committed no significant procedural error." *Gall*, 128 S. Ct. at 597. Second, we "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard[,] . . . tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.*

Martin's sentence was free of any significant procedural errors. A district court must properly calculate a defendant's advisory guidelines range, and there is no question that the district court did so here. A district court must also "place on the record an 'individual assessment' based on the particular facts of the case before it." *United States v. Carter*, 564 F.3d 325, 330 (4th Cir. 2009) (quoting *Gall*, 128 S. Ct. at 597). This explanation "need not be elaborate or lengthy," however. *Carter*, 564 F.3d at 330. That is especially true where, as here, the sentence is inside the advisory guidelines range. *Gall* was quite explicit that district courts should provide "more significant justification[s]" for major departures than for minor ones. 128 S.Ct. at 597. But when a district court does not depart or vary at all, it may provide a less extensive, while still individ-

ualized, explanation. *See United States v. Boyce*, 564 F.3d 911, 917 (8th Cir. 2009) ("Less extensive explanation is necessary when a guideline sentence is imposed."). This is because guidelines sentences themselves are in many ways tailored to the individual and reflect "approximately two decades of close attention to federal sentencing policy." *United States v. Johnson*, 445 F.3d 339, 342 (4th Cir. 2006).

Here, the district court provided an individualized explanation for imposing a guidelines sentence, observing that it was "satisfied" that such a sentence would fulfill the purposes in § 3553(a). J.A. 2860. Among other things, the court noted that despite Martin's "long, troubled criminal history," he had "just not gotten it yet." J.A. 2861. Therefore, it concluded, a guidelines sentence was "necessary" to "afford adequate deterrence" and "protect the public from further crimes." *Id.* While this explanation was not lengthy, it was individualized and sufficient to justify the sentence imposed. The district court outlined the defendant's particular history and characteristics not merely in passing or after the fact, but as part of its analysis of the statutory factors and in response to defense counsel's arguments for a downward departure. Accordingly, we find no procedural error.

Martin's sentence was also substantively reasonable. When reviewing for substantive reasonableness on appeal, we may presume that sentences that fall within a properly calculated guidelines range are reasonable. *Rita v. United States*, 127 S. Ct. 2456, 2462 (2007). Here, it was clearly reasonable for the district court to impose a sentence above the low end but still within the advisory range, given Martin's "significant and long-running involvement with drug distribution." J.A. 2862. Thus, we find that Martin's sentence was not only procedurally sound but substantively reasonable as well.

## VIII.

Lastly, Martin asks us to remand his case for resentencing in light of Amendment 706 to the Sentencing Guidelines,

which lowered the base offense level for drug offenses involving crack cocaine. *See* U.S.S.G. § 2D1.1 (2008); U.S.S.G. Supp. to App'x C, Amend. 706. Martin was sentenced prior to November 1, 2007, the effective date of the amendment. But the amendment became retroactive on March 3, 2008 while his appeal was pending. *See United States v. Brewer*, 520 F.3d 367, 373 (4th Cir. 2008) (discussing the history of Amendment 706).

Shortly after the opening briefs in this case were filed, we addressed this very issue in another case. We held that, under 18 U.S.C. § 3582(c)(2), it is "for the district court to first assess whether and to what extent [a defendant's] sentence may be . . . affected [by Amendment 706], and the [district] court is entitled to address this issue either sua sponte or in response to a motion by [the defendant] or the Bureau of Prisons." *Brewer*, 520 F.3d at 373. Accordingly, we declined to remand and affirmed without prejudice to the defendant's right to seek relief in the district court. *Id.*

Following *Brewer*, we do the same here. We are aware that Martin concedes that applying Amendment 706 will not change his advisory guidelines range, given that he is a career offender. But our decision nonetheless does not prejudice his ability to seek relief under § 3582(c)(2), for it is up to the district court to consider his request in the first instance.

## IX.

Because the claims raised by the defendants are without merit, the judgment of the district court is

*AFFIRMED*.