IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34174-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES WILLIAM KUNEKI, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — While serving time in the Klickitat County Jail, Charles Kuneki was accused by a cellmate of twice raping him late at night, with accompanying threats to kill if the cellmate did not submit. Mr. Kuneki admitted to intercourse with his cellmate, but claimed it was consensual. The State filed twin sets of first degree rape and felony harassment charges against him for the two alleged events. Following a jury trial, Mr. Kuneki was acquitted of the charges related to the first alleged event but was found guilty of the charges related to the second.

On appeal, he contends (1) the trial court improperly admitted forensic testimony over valid hearsay and confrontation clause objections, (2) the two convictions violated double jeopardy, (3) the trial court failed to give a "true threat" instruction, violating his rights under the First Amendment to the United States Constitution, and (4) his trial lawyer provided ineffective assistance of counsel when he failed to argue the two convictions were the same criminal conduct for sentencing purposes.

Because the State relied on the same evidence to prove the elements of first degree rape and the elements of felony harassment, double jeopardy applies. We vacate the conviction for felony harassment, rendering moot the other assignments of error relating to that conviction. We affirm the conviction for first degree rape.

FACTS AND PROCEDURAL BACKGROUND

One morning in August 2014 corrections officer Gloria Rosales was distributing inmate medications in the Klickitat County Jail when inmate R.M.[1] whispered that he wanted to speak with her. He was red-eyed, "like he'd been either crying or hadn't got any sleep." Verbatim Transcript of Proceedings (VTP) at 327. She took him to the booking room to talk but he started sobbing and was unable to speak. Another corrections officer, Andrew Gonzalez, took R.M. to a more private area, where R.M. told the officer that he had been raped by his cellmate, Charles Kuneki.

---

[1] We use the initials of the victim, R.M., to protect his privacy.

2

Sheriff's Deputy Randy Wells was called in to investigate and took R.M. to the hospital for a sexual assault examination. Under the supervision of an emergency room physician, a nurse took oral and rectal swabs. Together with blood, urine, and pubic hair samples, the swabs were sealed in a sexual assault evidence collection kit and given to Deputy Wells. Once back at the jail, R.M. provided the deputy with a written statement describing the rapes.

Mr. Kuneki was charged with two counts of first degree rape and two counts of felony harassment (threats to kill). A search warrant was obtained to take a DNA[2] sample from Mr. Kuneki. That, and R.M.'s sexual assault kit were forwarded to the Washington State Patrol Crime Laboratory. The lab determined that the DNA result from the anal swab of R.M. taken at the emergency room was a mixture of two individuals, and that the DNA profile from the nonsperm fraction of the anal swab matched R.M.'s DNA profile, while the DNA profile from the sperm fraction of the anal swab matched Mr. Kuneki.

At Mr. Kuneki's trial, the prosecutor told jurors in his opening statement, "We know that there was sexual intercourse. And the only issue is consent." VTP at 199. Mr. Kuneki's lawyer delivered his opening statement immediately thereafter, agreeing there was sexual intercourse and "it is a question of whether or not there was consent." *Id.*

---

[2] Deoxyribonucleic acid.

3

The defense lawyer reminded jurors that "as we discussed in selecting you as jurors," a homosexual act in and of itself is not a crime.[3] *Id.* at 206-07.

R.M. and Mr. Kuneki testified at trial to their different versions of their relationship and the nights of the alleged rapes. R.M. testified that on the first occasion, after accusing R.M. of having used his toothpaste, which R.M. denied, Mr. Kuneki grabbed a pencil, moved to where R.M. was lying on the bed, and told R.M. to be quiet— that if R.M. yelled, or screamed, or pushed a call button on the wall he would kill him. Holding the pencil to R.M.'s neck, he then pulled down R.M.'s pants and underwear to his knees. Repeating his threat to kill if R.M. made a sound, made R.M. raise his feet in the air (R.M. was on his back) and raped him anally for between 30 to 45 minutes.

R.M. testified that the next day, Mr. Kuneki followed him everywhere, making it impossible for R.M. to tell anyone what had happened. That night, he was sleeping on his stomach when, sometime between lockdown and midnight or 1:00 a.m., he awoke to find that Mr. Kuneki was on top of him, again armed with the pencil that he held to R.M.'s neck. According to R.M., he said to Mr. Kuneki, "Don't do this again," but Mr. Kuneki told him to shut up, penetrated his anus with his penis, and again raped R.M. for

---

[3] This portion of the opening statement is reported by the verbatim transcript of proceedings as partially inaudible, but based on what was discussed during jury selection, we are confident of this substance of the opening statement. *See, e.g.*, jury selection at Verbatim Transcript of Proceedings at 183 (obtaining juror agreement that if the sex is consensual, it is not rape, and that homosexual activity is not a crime).

30 to 45 minutes. VTP at 243. R.M. testified that Mr. Kuneki again threatened that if R.M. said anything or pushed the call button he would kill him.

In the defense case, Mr. Kuneki testified there had been a single instance of consensual sex. According to him, R.M. was openly gay and would grab at Mr. Kuneki's and other inmates butts during basketball games. Mr. Kuneki said he jokingly made comments like "[y]ou want that" after R.M. would grab at him. *Id.* at 463.

Mr. Kuneki stated that he and R.M. became "pretty close." *Id.* at 461. The men expected R.M. to be released before Mr. Kuneki, who was looking at prison time, and Mr. Kuneki told R.M. that when released, he could live in Mr. Kuneki's trailer free of charge in exchange for watching his place and his dogs and cashing checks Mr. Kuneki received from his tribe. Mr. Kuneki also said that when he was released, he would give R.M. a job. Eventually, following a proposition by R.M., Mr. Kuneki said they engaged in five minutes of consensual anal sex one Saturday morning around 1:00 a.m. Mr. Kuneki denied threatening R.M. in any way.

Mr. Kuneki said that it was after the two had an argument later that Saturday and Mr. Kuneki withdrew his offer of housing that R.M. made the rape allegations.

In the State's case, it called Heather Pyles, a forensic DNA analyst with the state patrol crime lab, to provide further evidence of the anal intercourse. Before she testified, and outside of the hearing of the jury, the trial judge asked, "[W]hy do we need all the forensic evidence[?]" observing "this is a consent case." *Id.* at 216. The prosecutor

stated that beyond the testimony of R.M. and the forensic evidence, the only evidence

that intercourse occurred would be the possible testimony of Mr. Kuneki, and "there's

nothing to guarantee Mr. Kuneki's going to testify." *Id.* at 217. He also told the court

that the forensic evidence "should go really quickly." *Id.* at 218.

Ms. Pyles testified to the crime lab's analysis of a sexual assault kit reportedly

collected from R.M. and an oral swab reportedly collected from Mr. Kuneki, which the

lab had determined to be a match for sperm in R.M.'s anal swab. After first describing

the DNA analysis process, she was asked "who did the initial testing" of evidence in Mr.

Kuneki's case and answered it had been Wendy Cashawbara, who was no longer

employed by the state patrol. *Id.* at 309.

When Ms. Pyle began to testify to the results of the lab's analysis, the defense

lodged a hearsay objection. The objection was overruled but the State still elicited

clarifying testimony from Ms. Pyles that although Ms. Cashawbara did the analysis, Ms.

Pyles did the "technical review" of Ms. Cashawbara's report, which she testified is

standard laboratory procedure:

> [A]s part of the process of completing a case, every case goes through a
> process called technical review. . . . [W]hat that means is . . . that I looked
> over all of the case file that she created, looked over all of her notes, and I
> compared that with our standard operating procedures and verified that
> everything that [Ms. Cashawbara] did was within our operating procedures,
> that it was technically sound and scientifically relevant, *and that I agreed*
> *with her conclusions* based on my review of her notes as well as the
> electronic data.

6

*Id.* at 311-12 (emphasis added).

The trial court overruled a second defense objection that Ms. Pyles "didn't do the testing," *Id.* at 312, and heard a few more complaints from defense counsel about the testimony. It allowed Ms. Pyles to testify to the lab's test result detecting semen in the anal swab taken from R.M., her conclusion that the profile from the sperm fraction of that anal swab matched Mr. Kuneki's DNA profile, and her calculation that the odds of some other individual having a DNA profile that would match the sperm fraction profile was one in 160 quadrillion.

The jury acquitted Mr. Kuneki of the first set of rape and harassment charges, but convicted him of the second set. It returned a special verdict stating that it had been unable to agree whether Mr. Kuneki was armed with a deadly weapon during the rape.

The trial court calculated Mr. Kuneki's offender score as a nine for the rape and an eight for the felony harassment. It sentenced Mr. Kuneki to the high end of the standard range on both counts, with the sentences to run concurrently. Mr. Kuneki appeals.

## ANALYSIS

Of the five assignments of error made by Mr. Kuneki, three prove dispositive. Given the State's evidence and argument at trial, we accept its concession that Mr. Kuneki's Fifth Amendment right to be free of double jeopardy was violated by entering judgment convicting him of both felony harassment and first degree rape. We vacate the felony harassment conviction.

7

As to the remaining conviction of first degree rape, we reject Mr. Kuneki's arguments that the trial court erroneously overruled his hearsay and confrontation clause objections.  Alternatively, we would find any error harmless.

We address the issues in the order stated.

*Double jeopardy*

Mr. Kuneki argues that his double jeopardy right was violated when he was punished for both first degree rape and felony harassment.  The State conceded the double jeopardy violation in its brief without elaboration  At oral argument, we questioned whether we should accept the State's concession.  The State's counsel on appeal, who also represented the State at trial, explained that its concession was based on the factual basis for the rape charge.  *E.g.*, Wash. Court of Appeals oral argument, *State v. Kuneki*, No. 34174-7-III (Oct. 18, 2017), at 13 min., 41 sec. to 14 min., 10 sec.[4]

The federal and state double jeopardy clauses protect against multiple punishments for the same offense.  U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *State v. Gocken*, 127 Wn.2d 95, 100, 896 P.2d 1267 (1995).  "Within constitutional constraints, the legislative branch has the power to define criminal conduct and assign punishment," so "the question whether punishments imposed by a court, following conviction upon criminal charges, are unconstitutionally multiple cannot be resolved without determining

---

[4] Available at http://www.courts.wa.gov/appellate_trial_courts/appellateDockets /index.cfm?fa=appellateDockets.showDateList&courtId=a03&archive=y.

what punishments the legislative branch has authorized." *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). Appellate courts review claims of double jeopardy de novo. *State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006).

The Washington Supreme Court has identified several steps to be taken in making the determination of what punishments the legislative branch has authorized. The first is to see whether the legislature expressed its intent in the criminal statute. A paradigm is the express provision that a burglary shall be punished separately from other crimes committed during commission of the burglary. *State v. Freeman*, 153 Wn.2d 765, 772, 108 P.3d 753 (2005) (citing RCW 9A.52.050). In this case, neither RCW 9A.44.040(1), which identifies when a person is guilty of the crime of rape in the first degree, nor RCW 9A.46.020(1), which identifies when a person is guilty of felony harassment, expressly authorize multiple punishment.

If the legislative intent is not clear, we may apply what Washington courts have called a "'same evidence'" or *Blockburger*[5] test, as rules of statutory construction for discerning legislative purpose. *Calle*, 125 Wn.2d at 778; *Freeman*, 153 Wn.2d at 772. Under the test, "If each crime contains an element that the other does not, we presume that the crimes are not the same offense for double jeopardy purposes." *Id.* In applying

---

[5] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

the test, we do not compare the statutory elements of each crime at their most abstract level; rather, "'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 817, 100 P.3d 291 (emphasis omitted) (quoting *Blockburger*, 284 U.S. at 304). Accordingly, a generic term that acquires meaning only from the facts of the case must be given its factual definition in order to assess whether one crime requires proof of *a fact* not required to prove the other. *Id.* at 818.

RCW 9A.44.040(1)(a) provides that "[a] person is guilty of rape in the first degree when such person engages in sexual intercourse with another person by forcible compulsion where the perpetrator . . . [u]ses or threatens to use a deadly weapon or what appears to be a deadly weapon." The "forcible compulsion" element acquires meaning only from the facts of the case. "'Forcible compulsion' means physical force which overcomes resistance, *or* a threat, express or implied, that places a person in fear of death or physical injury to [oneself] or another person." RCW 9A.44.010(6) (emphasis added). The State agreed at oral argument that in Mr. Kuneki's case, the type of forcible compulsion relied on was not "physical force which overcomes resistance," but was instead a threat that placed R.M. in fear of death or physical injury. This is borne out by the record. *See* VTP at 533, 535 (State's closing argument).

10

RCW 9A.46.020(1)(a) provides in relevant part that "[a] person is guilty of harassment if: . . . Without lawful authority, the person knowingly threatens: (i) To cause bodily injury immediately or in the future to the person threatened or to any other person; . . . [and] (b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out." Applying the *Blockburger* test at the concrete (as opposed to abstract) level, first degree rape includes an element that felony harassment does not: sexual intercourse. But felony harassment includes only elements that are elements of first degree rape as applied in Mr. Kuneki's case: a threat and resulting fear. Application of the *Blockburger* test supports the finding of a double jeopardy violation.

Although the result of the *Blockburger* test is presumed to be the legislature's intent, it is not controlling if there is clear evidence of contrary legislative intent. *Freeman*, 153 Wn.2d at 777.[6] Neither party suggests nor do we find that other evidence of legislative intent supports a conclusion that the legislature intended multiple

---

[6] In *State v. Eaton*, 82 Wn. App. 723, 919 P.2d 116 (1996), *reversed on other grounds by State v. Frohs*, 83 Wn. App. 803, 811 n.2, 924 P.2d 384 (1996), this court held that a defendant's convictions of both first degree rape and felony harassment *did not* violate double jeopardy. But in that case, the dispute was over whether the merger doctrine applied and this court correctly held that it did not. The merger doctrine is an additional tool for determining legislative intent. Under *Calle*'s approach, it is applied after the *Blockburger* test. We assume the *Blockburger* test was not urged as a basis for finding a double jeopardy violation in *Eaton* because in that case the acts constituting felony harassment were alleged and proved to continue after the rape.

punishments for the crimes with which Mr. Kuneki was charged.  Because conviction of both crimes violates double jeopardy, we vacate the conviction for felony harassment.[7]

*Hearsay and confrontation clause objections*

Mr. Kuneki assigns error to the admission of Ms. Pyles's testimony, arguing it was hearsay and violated his confrontation right.  We first consider whether a confrontation clause objection was made or was waived.

*Any challenge under the confrontation clause was waived*

Before error can be predicated on a ruling that admits evidence, an objection "stating the specific ground of [the] objection, if the specific ground was not apparent from the context" must be made.  ER 103(a)(1).  Mr. Kuneki's lawyer stated a specific ground for objection only once, and the ground was hearsay:

> Q   You did not do the tests.
> A   That is correct.
> Q   So you're going to be testifying as to Wendy's document.
> A   As to her report, yes.
> [DEFENSE COUNSEL]:   Now, I'm going to object that it's going to be hearsay.
> THE COURT:   Overruled.  Please proceed.

VTP at 311.

---

[7] The finding of a double jeopardy violation renders moot Mr. Kuneki's assignments of error to the trial court's failure to give a "true threat" instruction and his claim that counsel was ineffective for failing to argue same criminal conduct at sentencing.

Shortly thereafter, he objected without stating a specific ground for objection, but only that Ms. Pyles "didn't do the testing":

> A  . . . I looked over all of the case file that she created, looked over all of her notes, and I compared that with our standard operating procedures and verified that everything that Wendy did was within our operating procedures, that it was technically sound and scientifically relevant, and that I agreed with her conclusions based on my review of her notes as well as the electronic data.
> [DEFENSE COUNSEL]:   Your Honor, I'm going to object because she didn't do the testing.  And—she doesn't—
> THE COURT:   She—
> [DEFENSE COUNSEL]:   —testify.
> THE COURT:   She agrees she did not do the testing so she's responding as an expert in this field to a report [a] colleague of her[s] produced.
> [DEFENSE COUNSEL]:   Yeah.  So,—
> Q  —you—you have reviewed?
> A  Yes.  I have reviewed the data and independently came to the same conclusions as [Ms. Cashawbara] did.
> [DEFENSE COUNSEL]:   Yeah.  I'm still going to object.  She didn't do the testing.

VTP at 312.  If Mr. Kuneki's lawyer had a confrontation clause challenge in mind, he never stated it.  The words "confrontation" or "Sixth Amendment" were never used.  It was also not apparent from the context.  The trial court could reasonably understand defense counsel to be repeating his hearsay objection.  It evidently did, since the court's ruling ("she's responding as an expert in this field to a report [a] colleague of her[s] produced") was implicitly based on ER 703 and/or 705, which would apply to a hearsay objection but not to a challenge under the confrontation clause.

13

Mr. Kuneki argues that a confrontation clause violation is a manifest constitutional error that can be raised for the first time on appeal under RAP 2.5(a)(3). But we never reach that rule because the defendant's obligation to assert the right to confrontation at or before trial is more fundamental—it "is part and parcel of the confrontation right itself. . . . When a defendant's confrontation right is not timely asserted, it is lost." *State v. O'Cain*, 169 Wn. App. 228, 240, 279 P.3d 926 (2012) (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 326, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009)).

We also point out that a further consequence of defense counsel not making a confrontation clause challenge is that the record is not well-developed on which steps of the analysis Ms. Pyles repeated independently. At the time of trial, Ms. Pyles had been performing DNA analysis for nine years, and was competent to perform and explain it to jurors. Mr. Kuneki bases his argument on appeal to Ms. Pyle's statements that she did not do "the testing," but Ms. Pyles's testimony also includes a number of statements that she performed an independent analysis. *E.g.*, VTP at 312 ("I agreed with her conclusions" and "I have reviewed the data and independently came to the same conclusions"), 313 (Pyles was "able to develop DNA profiles"), 317 ("I did do a statistical estimate" for the profile from the sperm fraction.). As far as we can tell from the record, Ms. Pyle's involvement is indistinguishable from the testifying DNA analyst in *State v. Lui*, 179 Wn.2d 457, 489, 315 P.3d 493 (2014), *aff'd*, 188 Wn.2d 525, 397 P.3d 90 (2017), whose testimony did not violate the confrontation clause. That analyst

was held to be sufficiently involved to "produce her own analysis, 'an original product that can be tested through cross-examination.'" *Id.* (quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009)).

> She reviewed the results of the control samples, she reviewed the testing procedures, and she reviewed her subordinate analysts' results at each step in the process. She was 'a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue.' *Bullcoming* [*v. New Mexico*], [564 U.S. 647, 672,] 131 S. Ct. [2705, 180 L. Ed. 2d 610 (2011)] (Sotomayor, J., concurring).

*Id.* at 490-91. Mr. Kuneki cannot demonstrate from the record developed that Ms. Pyles could not be cross-examined about how she arrived at *her* interpretation and conclusions. That is all that the confrontation clause requires. *Id.* at 491.

### *Hearsay*

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). We can infer from the trial court's ruling that it overruled Mr. Kuneki's objection based on ER 703 and/or 705. ER 703 permits an expert to base her opinion on facts that are not otherwise admissible if they are of a type reasonably relied on by experts in the particular field. ER 705 grants the trial court discretion to allow an expert to relate hearsay or otherwise inadmissible evidence to the trier of fact to explain the reasons for her expert opinion. While we review many evidentiary decisions for manifest abuse of

discretion, we review whether or not a statement was hearsay de novo. *State v. Hudlow*, 182 Wn. App. 266, 281, 331 P.3d 90 (2014).

Mr. Kuneki points to the distinction between the expert's right to *base an opinion* on otherwise inadmissible facts and whether the expert should be allowed to *tell jurors* about those inadmissible facts. Notably, the most significant facts on which Ms. Pyles based her opinion were the testing results, which would probably have been admissible as business records under RCW 5.45.020,[8] although we recognize that the State did not attempt to offer the records themselves.

As to facts that were otherwise inadmissible, ER 705 grants the trial court discretion to allow an expert to relate hearsay or otherwise inadmissible evidence to the trier of fact to explain the reasons for her expert opinion. Mr. Kuneki does not demonstrate an abuse of discretion. For otherwise inadmissible facts that Ms. Pyles related under this rule, Mr. Kuneki was entitled to a limiting instruction if requested. ER 105 (providing that court "upon request" shall restrict the evidence to its proper scope and instruct the jury accordingly); *State v. Lui*, 153 Wn. App. 304, 323 and n.20, 221

---

[8] RCW 5.45.020 provides: "A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

P.3d 948 (2009), *aff'd*, 188 Wn.2d 525, 397 P.3d 90 (2017).  He did not request a limiting

instruction, however.

Finally, if the evidence had been admitted in error, it was harmless.  An erroneous

evidentiary ruling "is not prejudicial unless, within reasonable probabilities, the outcome

of the trial would have been materially affected had the error not occurred."  *State v.

Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981).  It was uncontested that Mr. Kuneki

engaged in anal intercourse with R.M.  Ms. Pyles's opinion that the odds were one in 160

quadrillion that someone other than Mr. Kuneki would match the sperm fraction profile

was irrelevant.  Her testimony did not shed light on the disputed issues of whether

intercourse took place once or twice, or whether it was consensual or not.

Mr. Kuneki argues that he was prejudiced because only Ms. Pyles provided

evidence of "Mr. Kuneki's 'semen in the rectum of the alleged victim,'" which he

contends would have been "inflammatory" for jurors.  Br. of Appellant at 21.  But Mr.

Kuneki never objected to Ms. Pyles's testimony on ER 403 grounds.  And we disagree

that Ms. Pyle's necessary references to "sperm," "semen," "anus" and "rectum" would

have discomfited jurors any more than the testimony of R.M., or Mr. Kuneki, or the

emergency room physician.

We vacate the conviction for felony harassment and remand to the superior court for any further proceedings consistent with our disposition.[9]

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, A.C.J.

Korsmo, J.

---

[9] Mr. Kuneki asked that we exercise discretion to not impose appellate costs if the State substantially prevailed. Since it has not, his request is moot.