Strafford
No. 2008-287

THE STATE OF NEW HAMPSHIRE

v.

ANTHONY DILBOY

Argued: January 20, 2010
Opinion Issued: April 20, 2010

*Michael A. Delaney*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Stephanie Hausman*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Anthony Dilboy, was convicted of two counts of manslaughter, *see* RSA 630:2 (2007), and two alternative counts of negligent homicide, *see* RSA 630:3 (Supp. 2005) (amended 2006), following a jury trial. On appeal, he argues that the Trial Court (*Fauver*, J.; *Houran*, J.) erroneously: (1) admitted toxicology evidence under New Hampshire Rules of Evidence 401, 402, 403, and 404(b); (2) denied his motion to suppress urine test results; (3) admitted evidence of lab test results in violation of the Federal Confrontation Clause; (4) instructed the jury that evidence of voluntary intoxication could satisfy the mental state element of reckless; (5) used a special verdict form, and (6) denied his motion to dismiss the class A felony negligent homicide charges. We affirm.

The record reveals the following. At approximately 1:45 p.m. on March 7, 2006, the defendant arrived at a friend's home to borrow her pick-up truck. The defendant then left just before 2:00 p.m. He later told the police he was on his way to Portsmouth to buy heroin.

At approximately 2:10 p.m., the defendant drove through a red light at a high rate of speed at the intersection of Indian Brook Drive and the Spaulding Turnpike in Dover. Mark Vachon, driving a Volvo sedan, was turning left at the intersection. Without slowing down, the defendant collided with the passenger-side of the Volvo, killing Vachon and his passenger, Alexander Bean.

Members of the Dover Police and Fire Departments arrived on the scene within minutes. They found the defendant standing beside the truck. He told the paramedics several times that he was addicted to heroin and suffering from withdrawal. He stated that he had taken three Klonopin tablets at 9:00 that morning, explaining that although he did not have a prescription for it, he was taking it to help with symptoms of heroin withdrawal. He denied using heroin that day. The paramedics started an IV, took a blood sample, and transported him to Wentworth Douglas Hospital.

Several officers from the Dover Police Department went to the hospital to interview the defendant, including Detective Brad Gould and Officers Daniel Gebers and David Martinelli. Gould arrived just before 3:00 p.m. and began interviewing the defendant. He told Gould that he was on his way to Portsmouth at the time of the accident, and had left at 10:00 a.m.

The defendant also told Gould that he was addicted to heroin but had not used it since March 5, approximately forty-eight hours before the collision, when he had "snorted a couple of bags." He said he used heroin approximately two or three times a week and substituted other drugs, such as Klonopin and methadone, when he could not get heroin. He explained that he had swallowed one Klonopin pill at approximately 9:00 the morning of the collision, and "crushed and snorted" the other two.

Gould testified that the defendant's "speech was sluggish" and "his movements appeared slow." The defendant fell asleep several times while he was at the hospital. At approximately 3:30 p.m., Gould asked the defendant if he knew what time it was, and he responded that it was about noon or 1:00 p.m.

Shortly after Gould began interviewing the defendant, Officer Martinelli arrived. The officers conferred, and decided to arrest the defendant. Gould told him that he was under arrest, while Martinelli read him his administrative license suspension (ALS) rights. Gould then read the defendant his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Four additional blood samples and a urine sample were then taken from the defendant at the hospital. The first blood sample was collected at

approximately 4:45 p.m. Some time between 4:45 and 5:00, after the defendant had invoked his right to counsel and while Gould was present in the room, a hospital employee asked the defendant for a urine sample, which he supplied. The police then obtained a search warrant for the defendant's clothing, hair, and three additional blood samples, which were drawn one hour apart, beginning at 6:33 p.m. Officer Gebers took custody of the four blood samples, as well as the blood sample the paramedics earlier collected. He also took custody of the urine sample collected by the hospital, and took all of the samples to the police station.

At approximately 8:00 p.m., after the hospital finished treating the defendant, Martinelli administered field sobriety tests, while Gebers recorded the results During the second part of the one-leg stand, Martinelli noticed that the defendant swayed slightly and saw muscle tremors in his legs. The officers then waited for the hospital to discharge the defendant, during which time he fell asleep again. Gebers testified that the defendant was cold and appeared to have a dry mouth.

The five blood samples and urine sample were tested at the State Police Forensics Toxicology Laboratory under the supervision of Dr. Michael Wagner, the assistant laboratory director. Dr. Wagner testified that the laboratory testing found a trace amount of Klonopin, trace amounts of cocaine, and a quantifiable amount of a metabolite of cocaine in one sample of the defendant's blood, and cocaine, a metabolite of cocaine, morphine, and Oxycodone in the defendant's urine. Dr. Wagner explained that "trace" amounts of drugs meant that the lab reliably detected drugs in the samples but in an amount insufficient to quantify. Dr. Wagner testified that the detection of a trace amount of Klonopin in the defendant's blood sample was consistent with his having ingested three pills between 9:00 and 9:20 a.m. on the day of the accident. He also stated that the presence of morphine, a metabolite of heroin, in the defendant's urine was consistent with his having used heroin up to two days prior to the accident.

Dr. Wagner also described the physical and cognitive effects of these substances. He stated that Klonopin is a central nervous system depressant that can affect a person for up to six hours, or longer if the person snorts it. He stated that Klonopin can make a person feel "more tired, lethargic" and be "less aware of [his] surroundings," and can slow a person's reaction time. It can also impair coordination, cognitive thinking, and vigilance, and cause dizziness and blurred vision. He further testified that symptoms of heroin withdrawal may begin within three to four hours after the last use. Within eight to twelve hours withdrawal may cause increased irritability and physiological changes in the body, including dry mouth, teary eyes, runny nose, tremors, muscle cramps, chills, goose bumps, and leg cramps. He explained that a user will experience peak withdrawal symptoms within

one to three days after using heroin, after which the symptoms decrease until up to ten days. Withdrawal may impair a user's "decision-making process" and reaction time. It may also produce "risk taking behavior." He opined that a person who ingests heroin two to three times a week, and who substitutes other drugs when unable to get heroin, shows "an addictive profile."

Before trial, the defendant filed several motions to suppress evidence. The defendant was found guilty on all four charges. The trial court sentenced him on the two manslaughter charges. This appeal followed.

*I. Toxicology Evidence*

We first consider whether the toxicology evidence should have been admitted. The defendant argues that the toxicology evidence was not relevant to prove he was "under the influence" or suffering the effects of withdrawal because the amount of drugs found in the samples was too small. He also argues that the toxicology evidence was cumulative given the other evidence about his recent drug use and his symptoms of heroin withdrawal. He next argues that the probative value of the toxicology evidence was substantially outweighed by the danger of unfair prejudice from its admission because such evidence is "inherently prejudicial." Finally, he argues the evidence should have been excluded under New Hampshire Rule of Evidence 404(b).

"We will not reverse the trial court's admission of evidence absent an unsustainable exercise of discretion." *State v. Dodds*, 159 N.H. 239, 248 (2009) (quotation omitted). To meet this threshold, "the defendant must show that the decision was clearly unreasonable to the prejudice of his case." *Id.* at 248-49 (quotation omitted).

All evidence must be relevant to be admissible. N.H. R. Ev. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.H. R. Ev. 403.

Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case. *State v. Jenot*, 158 N.H. 181, 185 (2008). "Unfair prejudice is not, of course, a mere detriment to [the objecting party's case],

in which sense all evidence offered . . . is meant to be prejudicial." *Id.* (quotation omitted). "Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision . . . on some improper basis, commonly one that is emotionally charged." *Id.* (quotation omitted).

■ The defendant first argues that the evidence was not relevant. A central issue at trial was whether the defendant was under the influence of drugs. The timing of his ingestion of Klonopin and heroin was crucial in determining the level of drugs in his system and the effects of withdrawal he was feeling at the time of the collision. Thus, the trial court reasonably found that the toxicology results were relevant to show whether the defendant had recently ingested certain drugs and was under the influence of those drugs.

The defendant next contends that the probative value of the toxicology evidence was substantially outweighed by the danger of unfair prejudice from its admission. The trial court reasonably could have determined that the evidence was highly probative of when the defendant last ingested drugs and, therefore, whether he was impaired at the time of the accident. Although the defendant admitted to ingesting heroin two days before the accident and Klonopin on the morning of the accident, there was evidence from which the jury could have found that his sense of time was distorted. For instance, while he told the police that he left at 10:00 a.m. to go to Portsmouth to buy heroin, in fact, he did not pick up his friend's truck until 1:45 p.m. Similarly, at the hospital, the defendant thought that it was 12:00 or 1:00 p.m., when, in fact, it was almost 3:30 p.m. Accordingly, the toxicology results were probative of when the defendant last ingested controlled drugs.

The trial court also could have reasonably determined that the probative value of the toxicology evidence outweighed its prejudicial impact. While the defendant contends that the presentation of the toxicology evidence could have confused the jury because the analysis revealed only trace amounts of drugs, Dr. Wagner explained the laboratory's methodology for determining the amount of drugs in the defendant's system, and explained what was meant by "trace" amounts of drugs. With respect to whether the evidence was cumulative, the toxicology evidence was more probative than other evidence regarding when the defendant actually ingested drugs and, therefore, was not cumulative. *See State v. Kornbrekke*, 156 N.H. 821, 827 (2008). Finally, the defendant's conclusory argument that evidence of drug use is "inherently prejudicial" fails because, as the trial court found, "the urine test results ha[d] minimal prejudicial effect [because] . . . the defendant's past drug use [was] not a contested issue" at trial. *See State v. Smalley*, 151 N.H. 193, 200 (2004). For all of the above reasons, therefore,

we hold that the trial court did not unsustainably exercise its discretion by admitting the toxicology evidence under New Hampshire Rules of Evidence 401, 402, and 403. *Dodds*, 159 N.H. at 248.

Finally, the defendant argues that the toxicology evidence was propensity evidence that should have been excluded under New Hampshire Rule of Evidence 404(b). Although "[e]vidence of other crimes, wrongs, or acts" is inadmissible "to prove the character of a person in order to show that the person acted in conformity therewith," such evidence may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." N.H. R. Ev. 404(b). To be admissible under Rule 404(b): (1) the evidence must be relevant for a purpose other than proving the defendant's character or disposition; (2) there must be clear proof that the defendant committed the act; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice to the defendant. *State v. Howe*, 159 N.H. 366, 375-76 (2009).

■ However, Rule 404(b) is inapplicable here because the evidence of the defendant's drug use was not evidence of "other crimes, wrongs, or acts," but evidence of acts which constituted part of the crimes charged. *Cf. State v. Kulikowski*, 132 N.H. 281, 287 (1989) (evidence of threats or coercive behavior not evidence of "other crimes, wrongs, or acts" but "evidence of the very threat which coerced the victim during the assaults in question"). Because the toxicology evidence was relevant, offered for reasons other than to prove the defendant's propensity to use drugs, and the trial court found that its probative value was not substantially outweighed by the danger of unfair prejudice, we conclude that the trial court's ruling was not clearly untenable or unreasonable. *See State v. Fandozzi*, 159 N.H. 773, 781 (2010).

## II. Illegal Seizure of Urine Sample

We next address the defendant's argument that the trial court erred in denying his motion to suppress the urine test results. After the defendant was arrested in his hospital room, Detective Gould advised him of his *Miranda* rights. While Gould was reading the first line of the *Miranda* rights form, the defendant responded, "[y]ou can talk to my lawyer." The trial court ruled that the defendant effectively invoked his right to counsel with this response. Gould, however, continued to interview the defendant. While they were speaking, a hospital staff person interrupted the interview to request that the defendant give a urine sample.

The defendant argues that the urine sample was illegally seized. First, he argues that the seizure was illegal because the police learned of the urine

sample during the illegal interrogation. Second, he argues that the police learned of the urine sample as a result of a privileged communication between himself and hospital personnel. He contends that because the police had no other basis of knowledge that the urine sample existed, the State cannot prove the police would have otherwise sought a warrant for it. Therefore, he argues, the urine was illegally seized and the court erred in admitting the results of its analysis.

The defendant's first argument, that Detective Gould improperly learned of the urine test because of the illegal interrogation, is not preserved because the defendant did not raise it in superior court. In his motion to suppress, the defendant argued that the urine sample was illegally seized because the police did not have a warrant for it. The defendant's motion for reconsideration did not mention Detective Gould's learning of the urine sample during an illegal interrogation. Therefore, because the defendant did not raise this argument in superior court, it is not properly before us now. *See State v. Ericson*, 159 N.H. 379, 386 (2009).

We next turn to the defendant's argument that the evidence should have been suppressed because the hospital violated his physician-patient privilege by requesting the urine sample in Gould's presence. The defendant argues that the hospital's request for a urine sample from the defendant was a "confidential communication" within the meaning of RSA 329:26 (amended 2008). RSA 329:26 provides that communications between a physician and patient are confidential.

Traditionally, we have carefully guarded the confidential relationship between patients and their medical providers. *State v. Sawtell*, 152 N.H. 177, 179 (2005). The physician-patient privilege is meant to encourage "patients to fully divulge personal, and at times, embarrassing, information so their medical providers can, in turn, provide complete and appropriate medical treatment." *In re Grand Jury Subpoena (Medical Records of Payne)*, 150 N.H. 436, 440 (2004). However, the presence of an extraneous third party during a privileged conversation operates to destroy the privilege. *See State v. Melvin*, 132 N.H. 308, 310 (1989). Because the defendant knew Gould was in the room, his presence destroyed the physician-patient privilege. *See Al-Asadi v. City of Phoenix*, No. CV-09-47-PHX-DGC, 2010 WL 716410, at *1 (D. Ariz. Feb. 24, 2010); *State v. Gillespie*, 710 N.W.2d 289, 298 (Minn. Ct. App.), *review denied* (Minn. 2006); *People v. Di Lenola*, 667 N.Y.S.2d 535, 535 (App. Div. 1997). Therefore, the request for the urine sample was not protected by the physician-patient privilege, and the trial court did not err by denying the defendant's motion to suppress.

*III. Confrontation Clause*

We next address the defendant's argument that the admission of Dr. Wagner's testimony about the test results for his blood and urine samples violated the Federal Confrontation Clause. The defendant argues that the test results are testimonial under the recent United States Supreme Court case of *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), and contends that they were inadmissible absent the testimony of the analyst who performed the tests. The State counters that *Melendez-Diaz* applies only to "formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Melendez-Diaz*, 129 S. Ct. at 2543 (Thomas, J., concurring). Because the defendant relies solely upon the Federal Constitution, we limit our review to his claims under the Federal Confrontation Clause. *State v. O'Maley*, 156 N.H. 125, 131 (2007), *cert. denied*, 129 S. Ct. 2856 (2009).

Before trial, the defendant moved to "preclude the State's experts from testifying to: (1) transmittal slips; (2) report of laboratory examination; (3) blood and urine sample collection forms; (4) blood test results; (5) EMT reports" and "evidence collection forms," arguing that the admission of such testimony would violate his right to confrontation. The trial court, relying upon *O'Maley*, permitted Dr. Wagner's testimony about the blood test results, concluding that "the transmittal slips, the blood sample collection forms, and the blood test results are non-testimonial." The court reasoned that "the blood test results . . . are [not] accusations."

Dr. Wagner testified that the laboratory conducts tests and analyzes "evidence at the request of law enforcement," and that he, along with the other laboratory employees, are "civilian representatives of the state police." Dr. Wagner explained that, primarily, he manages lab employees, "oversee[s] the development of [the] laboratories," and reviews and testifies about lab results. Although he does not test samples, Dr. Wagner is a "certifying scientist or senior toxicologist," and reviews the data, paperwork, comments, and "any issue that's involved in" sample analyses.

Dr. Wagner explained how the laboratory receives, processes, and tests samples, and what kinds of samples it tests. The laboratory performs two tests on samples: a screening test to look for families of drugs, and then a more specific test to determine "the particular drugs that are present" based on any positive results from the first test. The laboratory usually produces "a drug screen report and . . . a drug confirmation report" for a particular sample. Then, the laboratory issues a "results letter" about the sample at issue. It is unclear from the record who authored the results letters for the defendant's samples, or who performed the tests on the samples.

Dr. Wagner testified that he reviewed the test results for the defendant's samples. He testified that the laboratory found trace amounts of Klonopin, cocaine, and a metabolite of cocaine in the defendant's blood, and cocaine, a metabolite of cocaine, morphine, and Oxycodone in the defendant's urine. He discussed these substances and the likely effects of the drugs taken by the defendant on his body and mind depending on the mode of ingestion, and how long the drugs could remain in his body. Based upon the test results, Dr. Wagner opined as to when the defendant took the drugs at issue. Dr. Wagner also testified about the signs and symptoms of heroin withdrawal, its cognitive and physical effects, and the impact of the combination of the drugs the defendant took and heroin withdrawal on the defendant.

■ The Sixth Amendment "provides that in all criminal prosecutions, the accused shall enjoy the right to be . . . confronted with the witnesses against him." *Melendez-Diaz*, 129 S. Ct. at 2531. In *Crawford v. Washington*, 541 U.S. 36, 51 (2004), the United States Supreme Court held that "[a] witness's testimony against a defendant is . . . inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz*, 129 S. Ct. at 2531. "The crucial determination under *Crawford* as to whether an out-of-court statement violates the Confrontation Clause is whether it is 'testimonial' or not." *O'Maley*, 156 N.H. at 131. "Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51 (quotation omitted). Whether a statement is testimonial is a question we review *de novo. O'Maley*, 156 N.H. at 138.

■ In *Crawford*, the Court described the following as categories of testimonial statements:

> *ex parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (quotation, citations and ellipsis omitted).

*Melendez-Diaz* considered the admissibility of "three certificates of analysis showing the results of the forensic analysis performed on . . . seized substances" that identified the substances as cocaine. *Melendez-Diaz*, 129 S. Ct. at 2531 (quotation omitted). The certificates also described the weight of the bags containing the substances. *Id.* Analysts at the State Laboratory Institute of the Massachusetts Department of Public Health swore to the certificates before a notary public "as required under Massachusetts law." *Id.* The analysts did not testify at trial. *See id.*

The Court held that the certificates were testimonial because they were "quite plainly affidavits: declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths." *Id.* at 2532 (quotation omitted). The certificates were "incontrovertibly a solemn declaration or affirmation made for the purpose of establishing or proving some fact," and were "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." *Id.* (quotation omitted). The Court reasoned that the affidavits were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and noted that under Massachusetts law the "*sole purpose* of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Id.* (quotation omitted).

The Court explicitly stated that it did "not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Id.* at 2532 n.1. Although the prosecution has the obligation "to establish the chain of custody . . . this does not mean that everyone who laid hands on the evidence must be called." *Id.* (quotation and citation omitted). "[G]aps in the chain of custody normally go to the weight of the evidence rather than its admissibility." *Id.* (quotation and brackets omitted).

> It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live. Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records.

*Id.*

Justice Thomas, the only member of the majority to write a concurring opinion, wrote separately to note his continuing adherence to his "position that the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Id.* at 2543

(Thomas, J., concurring) (quotation omitted). He joined the majority opinion "because the documents at issue in this case are quite plainly affidavits," which "fall within the core class of testimonial statements governed by the Confrontation Clause." *Id.* (Thomas, J., concurring) (quotation omitted).

Although acknowledging that *Melendez-Diaz* "addressed a narrow category of testimonial statements" — "ex parte out-of-court affidavits of laboratory analysts regarding the drug tests" — the defendant argues that its reasoning applies to the admission of the test results through Dr. Wagner's testimony, because it "applies whenever a forensic test result is admitted without the testimony of the analyst." The State argues that *Melendez-Diaz* did not determine whether expert testimony like Dr. Wagner's is prohibited by *Crawford* and relies upon decisions from other courts upholding expert testimony similar to the testimony in this case. *See Larkin v. Yates*, No. CV 09-2034-DSF (CT), 2009 WL 2049991, at *1-2 (C.D. Cal. July 9, 2009).

In the wake of *Melendez-Diaz*, courts have considered the admissibility of expert testimony based upon testimonial statements, and have concluded that such testimony is inadmissible if the "witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009), *petition for cert. filed* (2010); *United States v. Alexander*, Nos. 2:04-cr-71, 2:09-cv-294, 2010 WL 404072, at *4 (N.D. Ind. January 25, 2010). "Allowing a witness simply to parrot out of court testimonial statements . . . directly to the jury in the guise of expert opinion would provide an end run around *Crawford*." *Johnson*, 587 F.3d at 635 (quotation omitted).

Some courts have concluded that an expert witness may not "recite or otherwise testify about the underlying factual findings of [an] unavailable medical examiner . . . contained in [an] autopsy report." *Com. v. Avila*, 912 N.E.2d 1014, 1029 (Mass. 2009) (expert witness's testimony must be confined to own opinions); *see Wood v. State*, 299 S.W.3d 200, 213 (Tex. App. 2009) (expert's testimony disclosing statements in autopsy report upon which his opinion was based violated Confrontation Clause), *petition for discretionary review filed* (2010). However, other courts have concluded that an expert may rely upon testimonial statements when the expert renders "an independent judgment" and applies his or her "training and experience to the sources before [the expert]" because the opinion is "an original product that can be tested through cross-examination." *Johnson*, 587 F.3d at 635; *see, e.g., State v. Hough*, No. COA09-790, 2010 WL 702458,

at *2, 5-6 (N.C. Ct. App. Mar. 2, 2010) (expert testimony reviewing laboratory tests, reviewing and confirming accuracy of tests performed by other analyst and identifying substances as marijuana and cocaine permissible even though based upon lab tests performed by non-testifying analyst); *United States v. Turner*, 591 F.3d 928, 932-34 (7th Cir. 2010) (expert testimony identifying substances, discussing testing procedures and safeguards, and peer reviewing the testing analyst's work admissible under *Melendez-Diaz*). Thus, although the test results relied upon by the testifying expert may be testimonial, expert testimony based upon those results may still be admissible. *See Johnson*, 587 F.3d at 635. Whether such testimony is admissible must be determined on a case-by-case basis. *See Davis v. Washington*, 547 U.S. 813, 827-30 (2006).

■ We agree with the latter approach. Here, although we assume that the test results were testimonial, Dr. Wagner's testimony did not violate the Federal Confrontation Clause. Dr. Wagner explained the procedures used and testing done by the lab, and that he reviews the data, paperwork, comments, and any other issues that arise with samples. Specifically, with respect to the defendant's samples, Dr. Wagner testified that he reviewed the test results, and explained that the laboratory had found trace amounts of Klonopin, cocaine, and a metabolite of cocaine in the defendant's blood, and cocaine, a metabolite of cocaine, morphine, and Oxycodone in the defendant's urine. Based upon the defendant's statements and the lab results, Dr. Wagner rendered his opinion as to the effects of the drugs taken by the defendant on his mind and body and as to when the defendant took the drugs. Finally, Dr. Wagner testified about the signs and symptoms of heroin withdrawal, its cognitive and physical effects, and the likely effects of the combination of the drugs taken by the defendant and heroin withdrawal on the defendant. Instead of "parrot[ing] out of court testimonial statements," *Johnson*, 587 F.3d at 635, Dr. Wagner generated opinions based upon his review of the test results, and the defendant had the opportunity to cross-examine him regarding his opinions as well as the laboratory procedures and test results. Accordingly, his testimony did not violate the Federal Confrontation Clause. *See Turner*, 591 F.3d at 932-34; *Johnson*, 587 F.3d at 635; *Hough*, 2010 WL 702458, at *6.

Moreover, *Melendez-Diaz* simply did not determine whether the technician or analyst who performed the scientific tests at issue must testify at trial. *See Yates*, 2009 WL 2049991, at *2 (although *Crawford* clearly established that the admission of affidavits is erroneous "the same cannot be said regarding a supervising expert's testimony about test results prepared by someone other than the testifying expert"); *Carolina v. State*, No. A09A2053, 2010 WL 103823, at *2 (Ga. Ct. App. January 13, 2010).

Justice Thomas' concurring opinion, in which he reaffirmed his belief that "the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," underscores the limited reach of *Melendez-Diaz*. *Melendez-Diaz*, 129 S. Ct. at 2543 (quotation omitted). Unlike the certificates at issue in *Melendez-Diaz*, Dr. Wagner was available for confrontation and cross-examination. *See Alexander*, 2010 WL 404072, at *4.

Finally, we address the continuing viability of *O'Maley* in the wake of *Melendez-Diaz*. As noted above, the trial court relied upon *O'Maley* in determining that the test results were non-testimonial. In *O'Maley*, we considered the admissibility of a blood collection form and Dr. Wagner's testimony about test results relating to the blood sample under the Federal Confrontation Clause within the context of a DWI prosecution. *O'Maley*, 156 N.H. at 127-28. The analyst who tested the blood in *O'Maley* did not testify, although Dr. Wagner reviewed the test results, "calculated the reported value of the . . . results," and prepared the final report. *Id*. at 127. We concluded that Dr. Wagner's testimony and the form were admissible under the Confrontation Clause. *Id*. at 138-40.

In reaching this determination, we noted that "the circumstances under which an out-of-court statement is generated is the critical inquiry." *Id*. at 138 (quotation omitted). We stated that "a crucial factor in determining whether a statement is testimonial or not is whether it represents the documentation of past events or the contemporaneous recordation of observable events." *Id*. (quotation omitted). We also considered two other factors: "whether the statement was prepared in a manner resembling *ex parte* examination" and "whether the statement is an accusation." *Id*. (quotation omitted).

We reasoned that the blood collection form was not an accusation, but "the technician's contemporaneous recordation of observable events." *Id*. The information on the form "was required by pertinent administrative rules," and the technician's statements on the form "were not a weaker substitute for live testimony at trial." *Id*. (quotation omitted). We concluded that "permitting Dr. Wagner to give his opinion of the test results, absent the testimony of the analyst who conducted the test, did not violate the defendant's Confrontation Clause rights." *Id*. at 139. The results were neutral, and, "to the extent that the actual reported test result is deemed to be accusatory, this result was reached and conveyed not through the nontestifying analyst's report, but by Dr. Wagner." *Id*. Finally, we noted that, had the testing analyst testified, her testimony would have been almost identical to that of Dr. Wagner. *Id*. at 140.

In *Melendez-Diaz*, the majority rejected the arguments that we relied upon in *O'Maley*. *See Silva v. Warden, N.H. State Prison*, Civil No. 09-cv-388-JD, 2010 WL 987026, at *4 (D.N.H. March 17, 2010). Specifically, *Melendez-Diaz* rejected the argument that "analysts are not subject to confrontation because they are not 'accusatory'" or "conventional" witnesses. *Melendez-Diaz*, 126 S. Ct. at 2533-35. *Melendez-Diaz* concluded that contemporaneous observations, statements not made in response to police interrogation and not involving observations of the crime, and testimony based upon "neutral, scientific testing" may still be testimonial. *Id.* at 2536. To the extent that portions of the analysis in *O'Maley* are inconsistent with *Melendez-Diaz*, they are no longer good law.

## IV. Jury Instructions

Next, the defendant argues that the trial court erroneously instructed the jury that voluntary intoxication may satisfy the reckless mental state element of the manslaughter charge, because that instruction impermissibly amended the manslaughter indictments. Specifically, the defendant argues that the grand jury did not charge that he was reckless because he was voluntarily intoxicated but unaware of the risk, and, therefore, he did not receive notice that the jury could find that he was reckless because he was voluntarily intoxicated.

Although the State argues that the defendant "effectively concedes that he did not preserve the issue for appeal," the State also contends that "it appears that the defendant did preserve this issue by a related objection slightly earlier in the trial." From this, we assume that the State does not challenge the preservation of the defendant's arguments.

RSA 626:2, II(c) (2007) provides:

A person acts recklessly with respect to a material element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the circumstances known to him, its disregard constitutes a gross deviation from the conduct that a law-abiding person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of having voluntarily engaged in intoxication or hypnosis also acts recklessly with respect thereto.

While instructing the jury, the court read the manslaughter indictments, which alleged that the defendant recklessly caused the deaths of the

victims because he was aware of and consciously disregarded the risk that death could result from his conduct because, in part, he drove his vehicle while under the influence of controlled drugs and/or while experiencing heroin withdrawal. After reading the elements of each manslaughter charge, the court defined "recklessly" as follows:

> Recklessly means the defendant was aware of and consciously disregarded a substantial and unjustifiable risk that death would result from his conduct. It is not enough for the State to prove the defendant failed to become aware of the risk involved. The State must prove the defendant was aware of the risk and consciously disregarded it. The risk must be of such a nature and degree that considering the circumstances known to him, his disregard constituted a gross deviation from the conduct that a law-abiding person would observe in the situation.

> If you find the defendant's actions were unreasonable and thoughtless, that's not enough. You must find the defendant disregarded a risk that was a substantial departure from what a law-abiding person would have done under those circumstances.

> A person who creates such a risk, but is unaware thereof solely by reason of having been voluntarily engaged in intoxication also recklessly — acts recklessly with respect thereto.

The final sentence of this instruction is almost identical to the final sentence of the statutory definition of "recklessly." *See* RSA 626:2, II(c).

The State argues that by alleging at the beginning of each of the manslaughter indictments that the defendant recklessly caused the death of another, it put the defendant on notice "that any of the facts alleged in the indictment could be used to prove recklessness." The State contends that, because RSA 626:2, II(c) states that a person acts recklessly when he or she "creates such a risk but is unaware thereof solely by reason of having voluntarily engaged in intoxication or hypnosis," and the indictment alleged that the defendant caused the deaths of the victims while under the influence, the defendant received adequate notice that the State could prove recklessness under any part of the statutory definition of recklessness, including voluntary intoxication. The State thus argues that the indictment correctly "charge[d] all of the 'statutory variants' contained in the definition of 'recklessly.'"

Because Part I, Article 15 of the State Constitution "protects a defendant from being convicted of a crime not charged in an indictment,"

the court "cannot freely amend indictments brought on the oath of a grand jury." *State v. Glanville*, 145 N.H. 631, 633 (2000) (quotation omitted). An impermissible amendment to an indictment "effects a change in the offense charged, or adds an offense." *State v. Bean*, 153 N.H. 380, 383 (2006) (quotation omitted). "Because an element of the offense charged is automatically considered part of the substance of an indictment, instructing the jury on an element not charged by the grand jury substantively changes the offense and therefore is grounds for automatic reversal." *Id.*

■ Here, the trial court did not amend the indictments by changing the offense charged or adding an offense not charged by the grand jury. *See State v. Bathalon*, 146 N.H. 485, 489 (2001) (holding that "[t]he trial court did not substantively amend the indictment by adding an element to the charged offense"); *cf. State v. Elliott*, 133 N.H. 759, 765 (1990) (trial court impermissibly amended indictment by instructing jury it could convict defendant of manslaughter without finding that defendant shot victim). Moreover, the defendant received notice that the State could attempt to prove that he was reckless because he was voluntarily intoxicated. *See State v. Gonzalez*, 143 N.H. 693, 707-08 (1999).

## V. Special Verdict Form

We next consider whether the use of a special verdict form constituted reversible error. The trial court informed the parties during trial that it intended to obtain special findings from the jury concerning the recklessness element of the manslaughter charges to identify which, if any, of the factual allegations contained in the indictments it found beyond a reasonable doubt. The defendant objected, arguing that the jurors could only convict him of manslaughter if the jury found that he committed all of the alleged acts. The trial court overruled the defendant's objection.

During its jury instructions, the court explained that the defendant had been charged with two counts of manslaughter. The court read the indictments, which alleged that the defendant:

> recklessly cause[d] the deaths of [Alexander Bean and Mark Vachon] in that being aware of and consciously disregarding the substantial and unjustifiable risks that death could result from his conduct, Anthony Dilboy did drive a Nissan pick-up truck at an excessive rate of speed through a red light on Indian Brook Drive and collided with a Volvo that had the right of way and was turning left . . . and at the time Dilboy was under the influence of one or more controlled drugs and/or suffering the effects of heroin withdrawal.

The court then stated that manslaughter has "two parts or elements" that the State must prove beyond a reasonable doubt; first, that the defendant "caused the death of another person"; and, second, that he "acted recklessly." The court defined recklessly, and then discussed the factual allegations in the indictments:

> Although you do not need to find all of the factual allegations occurred, you must reach a unanimous decision as to the acts that amount to recklessness. The factual allegations that you can consider in determining recklessness are:
>
> The defendant drove a vehicle at an excessive rate of speed;
>
> Collided with a vehicle that had a right of way;
>
> Drove through a red light;
>
> And at the time was under the influence of one or more controlled drugs and/or suffering the effects of heroin withdrawal.

The trial court instructed the jurors that they could "find that one, some, all or none of the factual allegations occurred," but that any such finding must be unanimous.

> Subsequently, the court explained the special verdict form to the jury:
>
> [T]his verdict form is one which asks you to make specific findings with respect to the charges. Specifically, the unanimous findings as to — under the manslaughter charge; as to the various acts which the State has charged constitutes reckless. And this is self-explanatory, and at the end — and you will — I'm going to ask you to consider each of those specific acts and make unanimous findings as to those. Among those are:
>
> The excessive rate of speed;
>
> Colliding with a vehicle that had a right of way;
>
> Passing through a red light;
>
> And whether he was under the influence of one or more controlled drugs.

Following a bench conference, the court again instructed the jury that "[t]here are these four areas that you're going to consider in determining whether or not the defendant acted recklessly," and that the jury did "not

have to find unanimously all four of those — find that the State has proven all four of those to determine whether or not the defendant acted recklessly and, therefore, [is] guilty of manslaughter."

The jury deliberated for a short period of time and then concluded for the day. The next morning, the defendant reiterated his objection to the special verdict form based upon "due process provisions of being full[y] apprised of the charges and . . . in a position to answer to them." Defense counsel also asserted that:

> I do worry that when you give them a checklist-type form, there is a tendency to be yes, yes, yes, yes, yes, and they have that set of forms and they have a separate set of instructions that you've given [them], but I worry they're just going to be drawn to the checklist.

The trial court overruled the defendant's objection, revised the special verdict form in an unrelated fashion, and submitted the new form to the jury. The form, in relevant part, posed the following questions to the jurors:

1. Do you unanimously find beyond a reasonable doubt that the defendant drove a vehicle at an excessive rate of speed?

   YES ___

2. Do you unanimously find beyond a reasonable doubt that the defendant drove a vehicle through a red light?

   YES ___

3. Do you unanimously find beyond a reasonable doubt that the defendant collided with a vehicle that had the right of way?

   YES ___

4. Do you unanimously find beyond a reasonable doubt that at the time the defendant was under the influence of one or more controlled drugs and/or suffering the effects of heroin withdrawal?

   YES ___

5. If you have unanimously agreed on one or more of the acts above, do you also find that act(s) sufficient to prove the defendant acted recklessly as defined in my instruc-

tions and that the reckless act caused the death of another?

YES ___

The jury convicted the defendant on all four counts. The jury checked "yes" after questions 1, 2, 3, and 5, and appeared to have checked "yes" for question 4, but then crossed it out and wrote "Ignore" with an arrow pointing towards the crossed-out check.

Relying on *State v. Surette*, 130 N.H. 531 (1988), the defendant contends that the form "impermissibly directed the jury's deliberation towards a guilty verdict" because: (1) each question provided for only an affirmative answer; (2) the form failed to require unanimity with respect to recklessness and causation, the two elements of manslaughter; and (3) "the form contain[ed] no separate response to indicate the verdict." The defendant argues that this was reversible error, but alternatively contends that the error was plain.

The State contends that, at trial, the defendant "argued only that the special verdict form was improper because it permitted the jury to find that he acted recklessly without finding that he was under the influence of drugs," and that it "allowed the jury to convict without finding that he knew the traffic light was red." The State thus argues that the *Surette* issue is not properly before us except under a plain error standard, and, that under *Surette*, its use was not plain error.

### A. Preservation

We first consider whether the defendant preserved his argument that the special verdict form improperly influenced the jury's deliberations. "The general rule in this jurisdiction is that a contemporaneous and specific objection is required to preserve an issue for appellate review." *State v. Ericson*, 159 N.H. 379, 386 (2009). "The preservation requirement recognizes that ordinarily, trial courts should have an opportunity to rule upon issues and to correct errors before they are presented to the appellate court." *State v. Brum*, 155 N.H. 408, 417 (2007). "The objection must state explicitly the specific ground of objection." *Ericson*, 159 N.H. at 386.

We conclude that the defendant preserved his argument that the special verdict form improperly influenced the jury's deliberations. The defendant argued that the special verdict form would draw the jurors "to the checklist" and that the checklist would prompt the jurors to answer "yes, yes, yes, yes, yes." The defendant thus alerted the trial court to the "substance of [his] objection" and gave the trial court the opportunity to correct any error. *See Brum*, 155 N.H. at 417.

## B. Special Findings

We now turn to the merits of the defendant's argument. Although the parties use the term "special verdict" to describe the form used by the trial court, "[a] true special verdict is one where the jury does not render a general verdict of guilty or not guilty, but simply finds certain facts and leaves the rest to the court." Note, *Beyond "Guilty" or "Not Guilty": Giving Special Verdicts in Criminal Jury Trials*, 21 YALE L. & POL'Y REV. 263, 263 (2003). Accordingly, "[t]rue special verdicts are almost never used in criminal cases, because by taking away the jury's power to render a verdict, they violate the Sixth Amendment right to have a jury make the ultimate determination of guilt." Note, *supra* at 263; *see United States v. Spock*, 416 F.2d 165, 180 (1st Cir. 1969) ("In a criminal case a court may not order the jury to return a verdict of guilty, no matter how overwhelming the evidence of guilt.").

Instead, at issue here are special findings, which "are disfavored in criminal trials." *United States v. Hedgepeth*, 434 F.3d 609, 613 (3d Cir.) (quotation omitted), *cert. denied*, 547 U.S. 1144 (2006). Such findings "provide additional information that accompanies, but does not replace, the general verdict." Note, *supra* at 263-64; *see United States v. Acosta*, 149 F. Supp. 2d 1073, 1076 (E.D. Wis. 2001). Special findings, such as those used by the court here, should be distinguished from the more widespread practice of providing the jury with a list of charges to take into the deliberation room. *See United States v. Gallishaw*, 428 F.2d 760, 765 (2d Cir. 1970) (distinguishing special findings form from checklist and summary of charges).

Although a few jurisdictions do not use special findings in criminal trials, *see* Note, *supra* at 267-68, 280; *State v. Osburn*, 505 P.2d 742, 749 (Kan. 1973), all of the federal circuit courts and forty-six of the state courts have utilized or approved of special findings in criminal trials in limited circumstances. Note, *supra* at 280. The First Circuit Court of Appeals has emphasized "that there is no mechanical *per se* rule of unconstitutionality for all special [findings] in criminal cases," and that special findings "may be permissible in federal criminal proceedings." *United States v. Inirio-Castro*, 61 Fed. Appx. 714, 717 (1st Cir. 2002) (quotation and ellipsis omitted), *cert. denied*, 540 U.S. 890 (2003). Courts use such findings to determine a variety of factual matters, as well as mixed determinations of fact and law. *See* Note, *supra* at 269-80; *see also, e.g., United States v. Delgado*, 4 F.3d 780, 792 n.5 (9th Cir. 1993) (requiring special interrogatories where facts introduced to jury "pose a genuine possibility of juror

confusion"); *United States v. Coonan*, 839 F.2d 886, 887-88 (2d Cir. 1988) (RICO prosecution); *Spock*, 416 F.2d at 183 n.41 (sentencing matters and treason cases).

However, courts have noted that special findings have the potential to confuse the jury, or shift or weaken the government's burden of proof. *See United States v. Wilson*, 629 F.2d 439, 442 (6th Cir. 1980). They can interfere with the jury's "right to render a general verdict without being compelled to return a number of subsidiary findings to support its general verdict." *Id.*; *see Spock*, 416 F.2d at 180-81. Special interrogatories may also impede the jury's power to nullify: "a jury is entitled to acquit the defendant because it has no sympathy for the government's position. It has a general veto power, and this power should not be attenuated by requiring the jury to answer in writing a detailed list of questions or explain its reasons." *Wilson*, 629 F.2d at 443. Special findings may also "partly restrict [the jury's] historic function, that of tempering rules of law by common sense brought to bear on the facts of a specific case." *United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998) (quotation omitted). Ultimately, "[w]hat is sacrosanct . . . is the right of a defendant to have the jury deliberate and apply the law free from judicial trammel." *United States v. Ogull*, 149 F. Supp. 272, 278 (S.D.N.Y. 1957).

"Special [findings] have the unique capacity to proselytize the jury to the guilt of a defendant." *State v. Simon*, 398 A.2d 861, 865 (N.J. 1979). In the seminal case of *United States v. Spock*, the First Circuit expressed its concern "with the subtle, and perhaps, open, direct effect that answering special [findings] may have upon the jury's ultimate conclusion." *Spock*, 416 F.2d at 182.

> There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step. A juror, wishing to acquit, may be formally catechized. By a progression of questions each of which seems to require an answer unfavorable to the defendant, a reluctant juror may be led to vote for a conviction which, in the large, he would have resisted. The result may be accomplished by a majority of the jury, but the course has been initiated by the judge, and directed by him through the frame of the questions.

*Id.*; *see Surette*, 130 N.H. at 535 (special verdict form "set the tone of the deliberations by directing the jury down a path towards a guilty verdict" and denied defendant's right to impartial jury).

However, special findings can also ensure jury unanimity and clarity in complex or confusing cases. Note, *supra* at 283, 287; *see, e.g., United States v. Ogando*, 968 F.2d 146, 148-49 (2d Cir. 1992); *State v. Diaz*, 677 A.2d

1120, 1127-28 (N.J. 1996). Special findings can facilitate appellate review, avoid the need for a new trial, and promote certainty and efficiency. *See* Note, *supra* at 289, 291.

We consider the propriety of the special findings in conjunction with the rest of the jury instructions. *See United States v. Desmond*, 670 F.2d 414, 418 (2d Cir. 1982). Ultimately, special findings are improper when their form "impermissibly directs the course of the jury's deliberation." Note, *supra* at 267; *see, e.g., People v. Ribowsky*, 568 N.E.2d 1197, 1201 (N.Y. 1991) (noting that special interrogatories have been approved "where the special findings benefited the defendant, were neither inherently prejudicial nor predeterminative of the jury's verdict or assisted the court" (citations omitted)); *Commonwealth v. Licciardi*, 443 N.E.2d 386, 390 (Mass. 1982) (special findings must avoid leading jurors down a path towards a guilty verdict).

Special findings made by the jury after it renders a general guilty verdict may pose less of a risk for prejudice. *See* Note, *supra* at 294; *United States v. Ruggiero*, 726 F.2d 913, 928 (2d Cir.) (Newman, J., concurring in part and dissenting in part) (encouraging courts to submit special findings "to be answered only in the event that the jury has agreed upon a general verdict of guilty"), *cert. denied*, 469 U.S. 831 (1984); *Simon*, 398 A.2d at 866 ("The prejudicial potential of special [findings] . . . might be . . . mitigated if they are integrated with the jury's final deliberations following a full, adequate general charge on all facts of the case." (collecting cases)). *But see Spock*, 416 F.2d at 183 ("Nor is it an answer that . . . the jury was informed that [the questions] were to be answered only if a general verdict of guilty had been reached."). Permitting the jury to answer special findings after reaching a general verdict "enables the jury to perform its generalized task first, responding to the [question] thereafter only if a guilty verdict reflects that the jury has found all of the elements of an offense established." *Ruggiero*, 726 F.2d at 928 (Newman, J., concurring in part and dissenting in part).

We review the trial court's decision to use special findings for an unsustainable exercise of discretion. *See, e.g., Hedgepeth*, 434 F.3d at 614; *United States v. Udeozor*, 515 F.3d 260, 271 (4th Cir. 2008); *United States v. Balderas*, 163 Fed. Appx. 769, 782 (11th Cir. 2005); *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining "unsustainable exercise of discretion" standard). This inquiry is fact-specific and case-specific. *See Simon*, 398 A.2d at 867.

In the case before us, we conclude that the trial court did not unsustainably exercise its discretion in submitting the special findings to

the jury because they did not "impermissibly direct[] the course of the jury's deliberation." Note, *supra* at 267. We acknowledge that the special findings used by the trial court were problematic: for example, the jury did not come to a guilty verdict before completing the special findings form. *See Hedgepeth*, 434 F.3d at 613; *Ruggiero*, 726 F.2d at 928 (Newman, J., concurring in part and dissenting in part). Moreover, although the list of findings tracked the factual allegations in the manslaughter indictments, they posed a number of questions to the jury and thus ran the risk of "directing the jury down a path towards a guilty verdict." *Surette*, 130 N.H. at 535; *see Spock*, 416 F.2d at 182; *cf. United States v. Southard*, 700 F.2d 1, 16 (1st Cir.) (two questions "reduced to a minimum the step by step process of determination of guilt"), *cert. denied*, 464 U.S. 823 (1983).

> The possibility . . . exists that fragmenting a single count into the various ways an offense may be committed affords a divided jury an opportunity to resolve its differences to the defendant's disadvantage by saying "yes" to some means and "no" to others, although unified consideration of the count might have produced an acquittal or at least a hung jury.

*Ruggiero*, 726 F.2d at 927 (Newman, J., concurring in part and dissenting in part). We also note that the special findings form gave options for the jury to answer only "yes" after each of the questions. Finally, the special findings form had the potential to direct the jury's focus to the "reckless" element of the manslaughter charge. *See Gallishaw*, 428 F.2d at 766 (cautioning against using forms that "emphasize[] various elements of what the Government is required to prove").

However, the jury's response to question 4 suggests that the form did not impermissibly direct the jurors' deliberations. *See Hedgepeth*, 434 F.3d at 614 (because jury found one special finding not proven and refused to convict on one charge, it suggested "that the jurors were not so swayed by the inclusion of the sentencing factors on the verdict slip that they could not engage in careful deliberation"). This case is unlike *Surette* where we concluded that, even though the trial judge orally gave the "model charge" on reasonable doubt, the failure to include the charge on the special findings form in conjunction with the nature of the form, was an unsustainable exercise of discretion. *Surette*, 130 N.H. at 535; *cf. Lambert*, 147 N.H. at 296. In *Surette*, the trial court submitted four special findings to the jury in a burglary trial:

Does the jury unanimously find beyond a reasonable doubt that:

1. John Surrette [*sic*] did, on or about March 7, 1986, purposely enter the dwelling occupied by Donald and Margaret Squires in Bedford in the nighttime?

Answer: _____

(Yes or No)

2. John Surrette was not licensed or privileged to enter the Squires dwelling at the time?

Answer: _____

(Yes or No)

3. The Squires dwelling was not open to the public at the time?

Answer: _____

(Yes or No)

4. John Surrette entered the Squires dwelling at the time with the purpose to exercise unauthorized control over property i.e. possessions belonging to the Squires with the purpose to deprive them of it?

Answer: _____

(Yes or No)

If any question is unanimously answered '*No*,' you must find the defendant not guilty of burglary.

The jury finds the defendant John

Surrette _____ of burglary.

(Guilty or Not Guilty)

*Surette*, 130 N.H. at 533. By contrast, here, the court twice instructed the jury that if it found the State "proved all the material elements of the offense charged beyond a reasonable doubt," then it "should find the defendant guilty." *See State v. Wentworth*, 118 N.H. 332, 838-39 (1978). The court's instructions in conjunction with the special findings form did not "create[] an impression inconsistent with *Wentworth*." *Surette*, 130 N.H. at 535 ("By stating that the jury must find the defendant not guilty if any one of the questions was answered 'no,' the form suggests that if all the answers were 'yes,' the defendant was guilty and the verdict must follow accordingly.").

In using the special findings form, the trial court had two primary goals. First, it sought to ensure juror unanimity on at least one of the factual allegations in the manslaughter indictments. The manslaughter indict-

ments contained four different factual allegations and thus could conceivably create juror confusion. Second, the trial court attempted to facilitate appellate review. If the jury had found that the State proved only one of the factual allegations contained in the indictments beyond a reasonable doubt, and the defendant challenged the sufficiency of the evidence supporting that allegation on appeal, the special findings form would have aided appellate review.

While we affirm the trial court's use of special findings in this case, we urge trial courts not to use special findings in criminal cases except in special, limited circumstances. As noted above, federal courts use special findings in limited circumstances, *see, e.g., Hedgepeth,* 434 F.3d at 613; *Inirio-Castro,* 61 Fed. Appx. at 717, and, in New Hampshire, special findings are statutorily mandated only in death penalty prosecutions. *See* RSA 630:5, IV (2007) (requiring jury to "return special findings identifying any aggravating factors" alleged "which are found to exist").

## VI. Negligent Homicide Indictments

Finally, we address whether the trial court erred in failing to dismiss the class A felony negligent homicide charges. Neither party addressed what should happen to the negligent homicide convictions if we affirmed the defendant's manslaughter convictions. We choose, however, to address the defendant's arguments that: (1) the evidence was insufficient to prove he was under the influence of drugs; and (2) suffering from the effects of withdrawal from drug use does not constitute being under the influence of that drug. The State contends that the defendant did not preserve his sufficiency argument because he did not raise it at trial. The State also argues that suffering from the effects of withdrawal constitutes being "under the influence" of drugs.

### A. Sufficiency of the Evidence

We first address the defendant's sufficiency argument. To preserve this issue for appellate review, the defendant was required to make a contemporaneous and specific objection below. *See State v. Wood,* 150 N.H. 233, 236 (2003).

At the conclusion of the State's evidence, the defendant moved to dismiss the two negligent homicide charges, arguing that the indictments were vague and that suffering from withdrawal was not enough to show he was "under the influence" of a controlled drug. At no point did the defendant argue that there was insufficient evidence to prove he was under the influence. Therefore, he "did not afford the trial court the opportunity

to correct an error it may have made, or to clearly explain why it did not make an error." *Id.* Because he did not properly preserve his sufficiency of the evidence argument, we will not consider it on appeal. *Id.*

### B. "Under the Influence"

We next address the defendant's argument that withdrawal from drug usage does not constitute being "under the influence" of a controlled drug within the meaning of RSA 630:3, II. The interpretation of a statute is a question of law, which we review *de novo. State v. Kousounadis*, 159 N.H. 413, 423 (2009). "In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole." *Id.* (quotation omitted). We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice. *See* RSA 625:3 (2007). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Kousounadis*, 159 N.H. at 423. Further, we interpret legislative intent from the statute as written and will not construe what the legislature might have said or add language it did not see fit to include. *Id.* Finally, we interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.*

RSA 630:3, II provides that "[a] person is guilty of a class A felony when in consequence of being under the influence of intoxicating liquor or a controlled drug or any combination of intoxicating liquor and controlled drug while operating a propelled vehicle . . . he or she causes the death of another." Nothing in the plain language of RSA 630:3, II indicates that the legislature intended to require a person to have controlled drugs present in their blood, resulting in an impaired driving ability. Rather, the language merely requires that one be under the influence of drugs, and as Dr. Wagner testified at trial, a person can continue to feel the effects of heroin eight to twelve hours after using it. In addition, he testified that a person may feel peak symptoms of withdrawal one to three days after the last use, and then continuing symptoms up to ten days later. These symptoms of withdrawal can include an increase in risk-taking behavior, and a decrease in a person's ability to divide his attention, a crucial skill in operating a motor vehicle.

We hold, therefore, that the element of being "under the influence" of a controlled drug may be proved by evidence that the defendant was suffering symptoms of withdrawal from drug usage. We have held that to prove a driver was "under the influence," the State need prove only that the driver was impaired "to any degree." *State v. Wiggin*, 151 N.H. 305, 309

(2004). Nothing in the statute limits such impairment to the time immediately following the ingestion of the drugs.

Our position is supported by *State v. Franchetta*, 925 A.2d 745 (N.J. Super. Ct. App. Div. 2007). In *Franchetta*, the trial court found that while the cocaine was not "pharmacologically active" when the defendant was apprehended, he was "physically impaired as a result of ingesting cocaine." *Id.* at 749. He was still suffering the "rebound effect" or "hangover effect" such that "his normal physical coordination was impaired so as to render him a danger to others on a highway." *Id.* at 746, 749.

The defendant argues that driving under the influence of drugs is analogous to driving under the influence of alcohol. He relies upon RSA chapter 265-A, the chapter on alcohol or drug impairment, to argue that a person could not be convicted of driving under the influence of alcohol with no blood alcohol content. He also cites RSA 265-A:11, I (Supp. 2009), which provides, in part, that "[e]vidence that there was, at the time alleged, an alcohol concentration of 0.03 or less is prima facie evidence that the defendant was not under the influence of intoxicating liquor." Thus, he argues, a defendant cannot be convicted of driving under the influence of drugs absent specific evidence beyond trace amounts of drugs in his bloodstream.

■■■■ Unlike the operating under the influence of alcohol statutes, however, there is no minimum requirement for levels of drugs in a defendant's system to prove he is under the influence. RSA 265-A:2, I (Supp. 2009) provides, in part, that "[n]o person shall drive or attempt to drive a vehicle upon any way . . . [w]hile such person is under the influence of intoxicating liquor or any controlled drug or any combination of intoxicating liquor and controlled drugs; or . . . [w]hile such person has an alcohol concentration of 0.08 or more." The defendant is correct that with respect to alcohol the legislature provided evidentiary rules concerning a minimum concentration of alcohol in his blood. However, although drugs and alcohol are contained within the same chapter, the statute contains no comparable rule regarding the level of drugs in a defendant's blood. Simply because the legislature established an evidentiary rule for blood alcohol content does not mean a comparable measure must exist for drugs.

We do not add language the legislature did not see fit to include, *Kousounadis*, 159 N.H. at 423, and we decline to adopt the defendant's interpretation of RSA 630:3, II.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, HICKS and CONBOY, JJ., concurred.