# Commonwealth v. Sally

C.P. of Philadelphia County, no. MC-51-CR-0032706-2009.

*Jason Harmon,* for commonwealth.
*Berto M. Elmore,* for defendant.

MOSS, *J.,* January 18, 2011—The defendants in the above-captioned actions were charged with driving under the influence of controlled substances in violation of 75 Pa. C.S. § 3802(d)(1) and (2). Following their arrests, the defendants had blood extracted from them. The blood was analyzed at a laboratory by the name of DrugScan that used gas chromatography and mass spectrometry. Dr. Richard

Cohn, a forensic toxicologist employed by DrugScan, issued two two-page reports that included findings that Mr. Walker's blood contained phencyclidine and that Mr. Sally's blood contained marijuana.

The reports were provided to defense counsel as part of discovery. Prior to trial, defense counsel advised the court that they intended to object to Dr. Cohn's trial testimony. Defense counsel argue that permitting Dr. Cohn to testify without having other persons present at trial who were involved in the analysis of their clients' blood would be a violation of their clients' Sixth Amendment right to be confronted with the witnesses against them. In support of their argument, they rely on *Melendez-Diaz v. Massachusetts,* 129 S.Ct. 2527 (2009), and *Commonwealth v. Barton-Martin,* 5 A.3d 363 (Pa. Super 2010). The commonwealth confirmed that it intended to call Dr. Cohn as an expert at trial without calling any of the other persons from DrugScan who were involved with the defendants' blood samples. The commonwealth asserted that doing so would not violate the defendants' right to confrontation.

The court decided to treat the proposed objections as in limine motions by the defendants. See *United States v. Turner,* 591 F.3d 928 (7th Cir. 2000). The court requested that a factual record be made of the manner and procedures used to analyze the defendants' blood. Additionally, the court directed the commonwealth to produce additional documents that were not included as part of Dr. Cohn's reports but which were related to the analysis of the

defendants' blood. These additional documents included the three pages of data and graphs produced by the gas chromatography / mass spectrometry machine.

This court must decide two questions. First, when applied to the present cases, do the holdings in *Melendez-Diaz* and *Barton-Martin* mandate that the commonwealth call witnesses other than Dr. Cohn to testify at trial? Second, does Dr. Cohn's proposed testimony contain any testimonial hearsay?

## I. *Factual Background*

At the hearing, the only witness who testified was Dr. Cohn. The parties agreed that Dr. Cohn was qualified as a forensic toxicologist. (N.T. at 15) Dr. Cohn explained that he was employed by DrugScan and that his primary function as a forensic toxicologist is to use his expertise with respect to specimens submitted by law enforcement agencies in Philadelphia, its surrounding counties and throughout the United States. (N.T. at 58-59)

Dr. Cohn described the procedure that DrugScan uses to analyze blood samples. These procedures involve a minimum of five to six DrugScan employees having access to or handling a blood sample. (N.T. at 96) He explained that blood samples come to DrugScan from the police with property receipts in two tubes, one with a gray top and the other with a red top. (N.T. at 17, 20) The tube with the red top contains no preservative and the tube with the gray top contains preservative used to prevent the blood from clotting. (N.T. at 82-83) Those tubes travel to the accession department where they are assigned an

accession number. (N.T. at 20-21, 36) The name of the person from whom the sample was taken, therefore, is unknown to those involved at DrugScan with the analysis of the sample. (N.T. at 21) The sample then undergoes a series of initial screening tests which are referred to in Dr. Cohn's report and "immunochemical assay." During his testimony, Dr. Cohn described the tests as being "exquisite and beautiful" but providing only an indication of what substances may or may not be in the blood sample. (N.T. at 22, 37-38)

After the initial screening tests, the blood samples travel to another person who adds one of several stock solutions to the blood sample depending on the results of the initial screening tests. (N.T. at 38) There is an established protocol for adding the stock solution that does not provide for any discretion on the part of the person who adds the stock solution. (N.T. at 38) The blood sample with the added stock solution is then placed in the machine that performs gas chromatography and mass spectrometry. (N.T. at 23, 39) Although the machine runs overnight with many mixtures, each mixture runs through the machine for between 13 and 20 minutes. (N.T. at 39)

Dr. Cohn testified that laboratory technicians and technologists handle the blood samples from the time they are delivered to DrugScan until the time that they are put into the gas chromatography and mass spectrometry machine. (N.T. at 46) A laboratory technician is required to have a bachelor's degree in one of the physical or biological sciences. (N.T. at 47) A laboratory technologist has either

a higher academic degree or more job experience. (N.T. at 48) Laboratory technicians and technologists perform their work in conformance with procedures and protocols developed by forensic toxicologists. (N.T. at 60) They do not generate any opinions that Dr. Cohn uses to develop his report and opinions. (N.T. at 48-49)

The gas chromatography / mass spectrometry machine produces printouts in the form of graphs and charts. It is this data that Dr. Cohn uses to form his opinion regarding what, if any, controlled substances and alcohol are contained in the blood samples. (N.T. 50-51) The reports authored by Dr. Cohn with respect to the defendants in this case, the data produced by the gas chromatography and mass spectrometry machine for the defendants in this case, and other DrugScan documents related to the defendants in this case were introduced into evidence at the hearing. Dr. Cohn explained the general procedure that he used to analyze each of the defendant's blood samples.

The form of Dr. Cohn's reports is the same. They both are signed by Dr. Cohn and contain sections with headings titled "toxicology report in the case of," "examination," "specimens," "findings," "comments," "conclusions," and "analysis summary." With respect to Mr. Sally, the findings and conclusion sections provided the following:

FINDINGS:

CANNABINOIDS (Marijuana) -

10.4 nanograms Delta-9-THC (Marijuana constitutent)/mL SERUM 214 nanograms

9-Carboxy-THC (Marijuana metabolite)/mL SERUM

Cannabinoids were detected by immunochemical assay, and were identified, confirmed and measured by gas chromatography/mass spectrometry.

*** *

CONCLUSION:

At and around the time the blood was drawn, it is reasonably scientifically certain that this individual was a recent, active user of the Schedule I hallucinogenic/depressant agent MARIJUANA. The blood THC and Marijuana metabolite levels found are consistent with Marijuana intake in dosage amounts capable of producing its pharmacological psychoactive effect, and thus, of rendering this individual unfit to safely operate a motor vehicle on the highway.

With respect to Mr. Walker, the findings and conclusion sections provided the following:

FINDINGS:

PHENCYCLIDINE (PCP) -

16 nanograms Phencyclidine/mL SERUM

Phencyclidine was detected by immunochemical assay, and was identified, confirmed and measured by gas chromatography/mass spectrometry.

*** *

CONCLUSION:

At and around the time the blood was drawn, it is reasonably scientifically certain that this individual -

- was a recent, active user of PHENCYCLIDINE in toxicologically significant amounts;

- was under the impairing psychoactive effects of Phencyclidine; and

- was unfit to operate a motor vehicle safely on the highway.

In *United States v. Gricco*, 2002 U.S. Dist. LEXIS 11413, Criminal Action No. 01-90 (E.D. Pa. April 25, 2002), Judge Padova found gas chromatography and mass spectrometry to be a scientifically reliable method of chemical analysis. In doing so, he provided an excellent explanation of gas chromatography and mass spectrometry based on the government's uncontested description in its memorandum and the evidence presented at a hearing. This explanation may be helpful in understanding the science involved. He wrote that:

Gas Chromatography analyzes a sample in its gaseous state. A small quantity of the sample is dissolved in a solvent and the resultant mixture is vaporized. A carrier gas stream sweeps the vaporized sample through a column in the instrument, and the separation process begins. The sample is broken down into its components as the gas stream carries it through the column. The column through which the vaporized sample passes is

coated with a liquid phase. The different components within the vaporized sample have different affinities for the liquid phase. Some will be attracted to the liquid phase and will be more soluble in that phase than other components. A component with a great affinity for the liquid phase will take longer to traverse the column than other components. The components, with their differing affinities for the liquid phase, emerge or elute from the column at different times, effecting the separation. When the component emerges from the tubing in the instrument, it enters a detector which translates the data into a graph or chromatogram. Each time a component emerges from the column, the chromatogram records a peak. Each peak represents a different component of the mixture. The horizontal axis on the chromatogram represents time elapsed in traveling the column, and the location of the peak along the horizontal axis indicates the identity of the component. The area under each peak indicates the relative proportional amount of each component in the mixture.

When Gas Chromatography is conjoined with a Mass Spectrometer, resulting in a GCMS instrument, the GC becomes the preparatory step to the MS analysis. MS can specifically identify the components of a sample substance, but only if the components are in pure form. The GC portion purifies and separates the components. The sampling components emerge from the GC column and are fed into the MS. MS identifies the components that the GC has separated by measuring the mass of the component compound and its fragments. The sample

goes into the ionization chamber of the MS, where it is bombarded by an electron beam. This ionizes the compound and creates a partial fragmentation of the compound. The resulting array of fragments, which is unique to the compound, is called the compound's fragmentation pattern. The ionized sample and its fragments are forced into an analyzer tube in a magnetic field, which separates the fragments according to their masses. As each fragment emerges from the analyzer tube, it enters the detector. When the fragment strikes the detector, it loses the charge it acquired while passing through the ion beam. The loss of the charge causes a current to activate the recorder, which produces a spectrum on a graph. The horizontal axis of the graph is the mass/charge axis. The vertical axis indicates the intensity or concentration of each peak. The highest peak, or "parent peak" is the unfragmented ion. The spectrograph produced by processing the unknown sample is then compared to spectrographs produced by processing known samples of various compounds to find a match. *Id.* at 9-12.

On cross-examination, defense counsel explored the possibility of human or machine error in the analysis process and the extent of Dr. Cohn's knowledge of what was done with their clients' blood samples. Defense counsel demonstrated that the technologists and technicians who handled their clients' blood samples may have more knowledge about what was done with those samples than Dr. Cohn. While such cross-examination may be effective at trial, it does not help with determining whether or not

Dr. Cohn's testimony would result in a violation of the defendants' Sixth Amendment rights.

## II. *Discussion*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right...to be confronted with the witnesses against him." U.S. Const. Amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the issue before the Supreme Court concerned a wife's tape-recorded statement to the police regarding an incident in which the defendant, her husband, allegedly stabbed a victim. At trial, the defendant claimed self-defense. The wife was precluded from testifying at trial because of a state marital privilege. Although the defendant was unable to cross-examine the wife's tape-recorded statement, the state presented the tape-recorded statement as evidence that the stabbing was not in self-defense.

The Supreme Court held that the trial court had erred in admitting the tape-recorded statement because to do so violated the confrontation clause's guarantee of the defendant's right to confront those who "bear testimony" against him. *Id.* at 51. Thus, the hearsay statement of a witness who does not appear at trial may be inadmissible against a defendant "unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 54.

The Supreme Court noted, however, that not every hearsay statement is the subject of the confrontation clause. Rather, it is only "testimonial statements" of a witness who does not appear at trial that are encompassed within the

protection of the confrontation clause because it is only that type of statement that makes a declarant a "witness" under the confrontation clause. *Id.* at 51. Although the Supreme Court in *Crawford* intentionally declined to set forth a comprehensive definition of "testimonial," it wrote that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68.

In *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), the prosecution introduced three "certificates of analysis" to show that the substances recovered from the defendant contained controlled substances. The certificates were sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health and contained only the statement that "[t]he substance was found to contain: Cocaine."

The court held that it was reversible error for the trial court to receive in evidence, over objection, the sworn certificates because they were the functional equivalent of the in-court testimony that the analysts would have provided had they appeared at trial. Therefore, since only the paper certificates were offered instead of the live testimony of the analysts, the court held that the defendant had been deprived of his constitutional right to meaningful cross-examination of the analysts who took the affidavit.

The court observed that an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination. Additionally, the court noted that the affidavits that the analysts submitted contained only the

bare-bones statement that "[t]he substance was found to contain: Cocaine." The court also observed that the defendant did not know at the time of trial what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed.

The court recognized that some of the methodology used by the analysts required the exercise of judgment and presented a risk of error that might be explored on cross-examination. In support, the court relied on two treatises concerning scientific evidence. One of the treatises identified "four critical errors that analysts may commit in interpreting the results of the commonly used gas chromatography/mass spectrometry analysis." *Id.* at 2537. The other treatise noted that "while spectrometers may be equipped with computerized matching systems, forensic analysts in crime laboratories typically do not utilize this feature of the instrument, but rely exclusively on their subjective judgment." *Id.* at 2537-2538. These examples of the type of interpretative errors that might be explored during cross-examination are the type of errors that someone like Dr. Cohn might make and not the type of human errors that a laboratory technician or technologist might make.

The court placed at least one limitation on the scope of its holding. It recognized that the confrontation clause did not require the prosecution to call as a witness every individual whose testimony may be relevant "in establishing the

chain of custody, authenticity of the sample, or accuracy of the testing device." *Id.* at 2532 n.l. Rather, the court observed that "[i]t is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence." *Id.*

Many state and federal courts have explored the meaning of the Supreme Court's decision in *Melendez-Diaz*, In Pennsylvania, the Superior Court relied on *Melendez-Diaz* for its decision in *Commonwealth v. Barton-Martin*, 5 A.3d 363 (Pa. Super 2010). In *Barton-Martin*, the defendant was charged with driving under the influence of alcohol. The defendant's blood was taken and analyzed at Hanover Hospital. At trial, the commonwealth introduced a hospital lab report into evidence showing that the defendant's blood alcohol content was .209 percent. The witness used by the commonwealth to lay a foundation for the introduction of the hospital lab report was the hospital's laboratory administrative director and custodian of records. Although she testified about the chain of custody of the defendant's blood sample and the equipment and methods used to test the defendant's blood, she was not the person who tested the blood. The Superior Court held that the defendant's rights under the confrontation clause were violated and that the lab report was inadmissible because the commonwealth did not summon at trial the analyst who prepared the lab report.

The defendants in the present cases contend that the holdings in *Melendez-Diaz* and *Barton-Martin* require the commonwealth to call at trial the laboratory technologists

and technicians who handled their blood sample and used the gas chromatograph / mass spectrometry machine. The defendants and the commonwealth may call those laboratory technologists and technicians to testify at trial. The failure, however, of the commonwealth to do so does not violate the defendants' Sixth Amendment right to confrontation because Dr. Cohn's proposed testimony concerning the substances in the defendants' blood does not contain any testimonial hearsay.

The factual settings in *Melendez-Diaz* and *Barton-Martin* are significantly and importantly different from the cases presently before the court. As noted above, *Melendez-Diaz* and *Barton-Martin* involved the introduction of documents. In *Melendez-Diaz*, those documents were notarized certificates. In *Barton-Martin,* the document was a hospital laboratory report.

Unlike in *Melendez-Diaz* and *Barton-Martin*, Dr. Cohn will testify at trial to the facts and opinions contained in his report.[1] The documents in *Melendez-Diaz* and *Barton-Martin* were objectionable because they were testimonial hearsay. In *Melendez-Diaz*, the certificates contained the

---

1. The court understands that the commonwealth does not intend to seek to introduce Dr. Cohn's reports into evidence. Rather, Dr. Cohn will testify in accordance with his reports. With Dr. Cohn present to testify, his reports would be inadmissible if objected to by the defendants. See *Cotia Steel v. M/V Jag Vidya*, 1996 U.S. Dist. LEXIS 5580 (E.D. La. April 22, 1996). (In sustaining an objection to the introduction into evidence of two testifying experts' reports, the court noted that the Federal Rules of Evidence do not allow for the introduction of expert reports into the record in the face of an objection by an opposing party.) Like the Federal Rules of Evidence, the Pennsylvania Rules of Evidence would bar the introduction of Dr. Cohn's reports into evidence if the defendants objected.

opinions of analysts at the State Laboratory Institute of the Massachusetts Department of Public Health who opined that the substances they had analyzed contained cocaine. In *Barton-Martin*, the hospital lab report contained the opinion that the defendant's blood alcohol content was .209 percent. Although the hospital's laboratory administrative director testified at trial, it was not her opinion that was contained in the hospital lab report.

*Barton-Martin* also illustrates that a defendant's Sixth Amendment right to confrontation is not satisfied by having someone present at trial to testify who is knowledgeable but is merely a surrogate for the declarant of the testimonial hearsay. In *United States v. Blazier*, 2010 CAAF LEXIS 1053, No. 09-0441, slip op. at 10-11 (C.A.A.F. Dec. 1, 2010), the court observed that:

> While reasonable minds may disagree about what constitutes testimonial hearsay, there can be no disagreement about who is the "witness" the accused has the right to confront. That "witness" is the declarant.... Accordingly, the right of confrontation is not satisfied by confrontation of a surrogate for the declarant.... Furthermore, "reliability" is no substitute for this right of confrontation....While "reliability" is the end, the right of confrontation is the means, and it is the means (rather than the end) that the Sixth Amendment insists upon.

Similarly, an expert witness may not act as a conduit for repeating testimonial hearsay. In *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009), the court explained

that the Supreme Court's holding in *Crawford* does not prohibit "expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence." The court also recognized the danger that an expert might be "used as little more than a conduit or transmitter for testimonial hearsay." *Id.* It held that the question when applying *Crawford* to expert testimony is "whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay." *Id.*

The defendants contend that the data from the gas chromatography/mass spectrometry machine upon which Dr. Cohn relies constitutes the testimonial hearsay statements of the laboratory technicians and technologists who use the machine. This court and other courts that have considered this issue have not agreed with the defendants.[2]

Pennsylvania and Federal Rule of Evidence 801(a) define a "statement" as either an "oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Additionally, Pennsylvania and Federal Rule of Evidence 801(b) define "declarant" as "a

---

2. In the findings section of both of his reports, Dr. Cohn notes that the controlled substance at issue "was detected by immunochemical assay." Based on his testimony about the initial screening tests, it is unlikely that this finding is one about which he would need to testify. If, however, Dr. Cohn would testify about the initial screening tests, this court does not have enough information about them to determine if such testimony would implicate testimonial hearsay. The court does not know if the doctor's finding is based on a machine's data or whether it is based on the opinion of a laboratory technician or technologist.

person who makes a statement." Based, in part, on these rules of evidence, courts throughout the country have recognized that machine-generated data and printouts are not hearsay statements because machines are not declarants and their data and printouts are not statements. Therefore, machine-generated data and printouts are not testimonial hearsay. *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008) ("[T]he confrontation clause does not forbid the use of raw data produced by scientific instruments, though the interpretation of those data may be testimonial."); *United States v. Washington*, 498 F.3d 225, 230-231 (4th Cir. 2007) ("The raw data generated by the diagnostic machines are the 'statements' of the machines themselves, not their operators."); *United States v. Blazier*, 2010 CAAF LEXIS 1053, No. 09-0441, slip op. at 16 (C.A.A.F. Dec. 1, 2010); *State of New Mexico v. Bullcoming*, 147 N.M. 487, 226 P.3d 1, cert. granted, 131 S. Ct. 62 (2010); see also *United States v. Lamons*, 532 F.3d 1251, 1263 (11th Cir. 2008); *United States v. Hamilton*, 413 F.3d 1138, 1142-43 (10th Cir. 2005); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003); Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* §380 (2d ed. 1994) ("[N]othing 'said' by a machine...is hearsay").

Although not of constitutional significance, the rules of evidence have an impact on Dr. Cohn's proposed testimony. Machine-generated data and printouts may be relied upon by an expert witness subject to the rules of evidence governing expert testimony.

Pa.R.E.703 provides the following rule on the bases of an expert's opinion:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Additionally, unlike its federal counterpart, Pa.R.E. 705 requires an expert to "testify as to the facts or data on which the opinion or inference is based."

At trial, Dr. Cohn will have to establish that the data and printouts produced by the gas chromatography/mass spectrometry machine are of a type reasonably relied upon by forensic toxicologists. He will also have to testify about the data and printouts because they are the bases of his opinion as to what substances are in the defendants' blood samples. In *Bullcoming*, 147 N.M. at 496,226 P.3d at 10, the court "strongly suggested[ed] that, in future cases, the State admit into evidence the raw data produced by the gas chromatograph machine to supplement the live, in-court testimony of its forensic analyst...[so that] the jury will be able to ascertain first hand the accuracy and reliability of the analyst's testimony regarding a defendant's BAC." Under Pennsylvania's rules of evidence, it would appear that the admission of the data and printouts is mandatory since they are the data upon which Dr. Cohn's opinion is based.

The court notes that Pa.R.Crim.P. 573(B)(1)(e) requires the commonwealth to disclose to the defendant's attorney "any results or reports of scientific tests" provided that "they are material to the instant case." The court holds that the data and printouts produced by the gas chromatography / mass spectrometry machine are results of scientific tests that are material to any case in which Dr. Cohn will testify and, therefore, should be disclosed by the commonwealth as part of mandatory discovery.

### III. *Conclusion*

The interplay between the confrontation clause, the Pennsylvania Rules of Evidence and expert scientific testimony is a fascinating topic with many more twists and turns than this opinion discusses. Any court addressing such issues should be mindful of the Supreme Court's admonition in *Melendez-Diaz*, 129 S.Ct at 2536, that:

> [T]here are other ways - and in some cases better ways - to challenge or verify the results of a forensic test. But the Constitution guarantees one way: confrontation. We do not have license to suspend the confrontation clause when a preferable trial strategy is available.

The court addresses in this opinion only the particular issues in the two cases that are before it. This opinion does not address, for example, the issue of whether or not an expert may provide an opinion that is based, in part or in whole, on testimonial hearsay. See *State v. Dilboy*, 160 N.H. 135, 151, 999 A.2d 1092, 1104 (N.H.2010) (The court concludes that test results are testimonial hearsay,

reviews various approaches taken by other courts to this issue, and holds that having an expert whose opinion is based on such testimonial hearsay does not violate the confrontation clause.); *United States v. Turner,* 591 F.3d 928(7th Cir. 2010) (reference by expert during his examination to an analysis of a nontestifying analyst's report that the court deemed to be testimonial hearsay did not violate the confrontation clause).

This court also recognizes the importance of understanding the science involved. Scientific testing that does not involve machine-generated data may require the commonwealth to provide someone other than just an expert like Dr. Cohn at trial. See *People v. Dendel,* 2010 Mich. App. LEXIS 1602, No. 247391 (Mich. Ct.App. Aug.24, 2010) (the finding of a nontestifying toxicologist that the deceased's glucose level was zero at the time of death was the fact on which the testifying expert based his opinion and was testimonial hearsay). The Supreme Court may address some or all of these issues when it renders a decision in *State of New Mexico v. Bullcoming,* 147 N.M.487, 226 P.3d 1, cert. granted, 131 S.Ct. 62 (2010).

For all of the foregoing reasons, the court denies the defendants' in limine motion to preclude Dr. Cohn from testifying at trial unless any laboratory technicians and technologists who used the gas chromatography / mass spectrometry machine also testified. Since Dr. Cohn's proposed testimony does not implicate any testimonial hearsay, it does not run afoul of the confrontation clause.